UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| SAMUEL E. DODD,<br>*Plaintiff,*<br>vs.<br>SUE P. SHEPPARD, et al.,<br>*Defendants.* | C.A. No. 05-519 S |

# DEFENDANTS' POST-TRIAL MEMORANDUM OF LAW

## I. INTRODUCTION

On March 14, March 15 and March 16, 2006, this Court received testimony from five witnesses in connection with the bench trial. The parties and the Court have the benefit of the trial transcript.

In this post-trial memorandum, defendants will follow the same order of issues as set forth in their pre-trial memorandum of law. Some issues do not require reference to any of the evidence adduced at trial; thus, defendants will simply rely on the law submitted in their pre-trial memorandum. Defendants will cite the testimony and refer to the exhibits that may help the Court in deciding the various issues.

## II. PROPOSED FINDINGS OF FACT — REVISED

Defendants have revised the findings of fact so as to be in accord with the testimony and evidence submitted. The revised portions are italicized, for comparison purposes, with the original proposed findings of fact.

1. Pursuant to the mandate of R.I.G.L. 42-28.3-1, the plaintiff undertook the requisite psychological examination as a last requirement for his employment with the Pawtucket Police Department.

2. The plaintiff received an unsatisfactory rating on this psychological exam based in part on the belief that plaintiff was not truthful or forthcoming during the examination process. Plaintiff was thus ineligible for employment with the Pawtucket Police Department.

3. The plaintiff was aware that he could not be hired by the Pawtucket Police Department because of his unsatisfactory rating on his psychological examination. *In fact, he was advised of this by Captain Bruce Moreau.*

4. In November 2003, the plaintiff changed his name from "Samuel Apkarian" to "Samuel Dodd."

5. Under his new name, the plaintiff filed an application with the Town of Lincoln for the position of police officer on or about October 19, 2004.

6. Plaintiff was selected for employment as a Lincoln Police Officer subject to a number of prerequisites including passing a psychological examination and successfully graduating from the Municipal Police Academy.

7. Although the plaintiff advised officials at the Town of Lincoln that he had changed his name, he failed to disclose to the testing facility (the same testing facility that tested him for his Pawtucket appointment) that he had changed his name or that he had previously undergone a psychological examination and failed to receive a satisfactory rating. *Plaintiff did indicate that he had previously taken a psychological examination.*

8. In connection with his psychological examination, plaintiff was required to fill out a personal history form. He failed to disclose in that form that he was known by another name.

9. The form requested that an applicant indicate whether or not a previous psychological examination had been taken and failed. The plaintiff responded by stating "not to my knowledge."

10. The form also asked the plaintiff to list all legal difficulties including being stopped by the police, traffic violation, arrest, etc. The plaintiff responded by stating "none." Yet, the plaintiff had been stopped for speeding at least six or seven times.

11. Based in part on this misinformation, the plaintiff received a satisfactory rating for his psychological examination and began his training at the Municipal Police Academy.

12. The plaintiff completed his training, graduated from the academy and was sworn in as a probationary member of the Lincoln Police Department on July 1, 2005.

13. When plaintiff was sworn in as a member of the Lincoln Police Department on July 1, 2005, he became a probationary police officer. As such, he was not a part of any Collective Bargaining Agreement between regular police officers and the Town. Rather, pursuant to the Town Charter, plaintiff was required to complete a probationary period of six months before being appointed a regular officer.

14. In early August of 2005, Dr. Gallagher was contacted by Captain Moreau from the Pawtucket Police Department who asked how the plaintiff could have failed the psychological examination for his Pawtucket application (thus making him ineligible for employment) yet pass the psychological examination for his employment with Lincoln.

15. Dr. Gallagher is the Director of the testing services. She was unaware of the plaintiff's name change. Upon further investigation, Dr. Gallagher discovered that plaintiff had provided false information in addition to failing to inform the services of his name change and the failed test.

16. The false information provided by plaintiff voided his satisfactory rating on the psychological examination for the Town of Lincoln.

17. In the next few days, Dr. Gallagher contacted the Lincoln Town Administrator, Sue Sheppard (hereinafter "defendant Sheppard") and advised her of the plaintiff's nondisclosures and the void test results.

18. After advising Deputy Chief Sullivan and receiving additional information through him regarding a background investigation conducted by the City of Pawtucket, defendant Sheppard determined that the plaintiff should be severed from employment with the Town of Lincoln.

19. On August 24, 2005, plaintiff was advised to attend a meeting with defendant Sheppard and other officials in the Town.

20. Some fifteen minutes before meeting with the plaintiff, defendant Sheppard met with the Chief of Police and advised him of the circumstances. Chief Kells immediately agreed with defendant Sheppard's assessment that plaintiff should be terminated. After the two discussed how to address this with plaintiff, plaintiff was called into the room.

21. Chief Kells began the meeting by advising plaintiff about the information that had been uncovered. *Chief Kells then asked plaintiff to leave the room so he could speak with defendant Sheppard and the other officials. The Chief of Police then indicated that he did not support the decision to sever the employment of the plaintiff.* After further discussion among the officials, plaintiff was called back into the room for further discussion regarding his untruthful responses during the application process.

22. Defendant Sheppard thereafter advised the plaintiff that he was going to be terminated unless he elected to resign.

23. Plaintiff elected to resign.

24. Plaintiff was allowed to go home and gather his police issued gear and to return to the station. During this time, Deputy Chief Sullivan arranged for an in-house police officer who serves as a counselor to meet with the plaintiff. The counselor met with the plaintiff for thirty to forty minutes and thereafter, the plaintiff typed out his resignation letter.

25. The next day, the plaintiff sought to withdraw his resignation but defendant Sheppard denied his request.

## III. POST-TRIAL ARGUMENT

### A. Procedural Due Process

#### *1. Plaintiff Does Not Have a Property Right to Continued Employment.*

Faced with the consequences of his conduct, the plaintiff made a clear decision to resign. In striking contrast to the plaintiff's challenge brought before this Court, the evidence revealed an air of acceptance and concession exhibited by the plaintiff at the August 24, 2005 meeting. There was little protest by him about any of the allegations charging him with deceit. Rather, the evidence revealed an individual who knew his transgressions had been discovered, who so determined his best option was to resign.

When asked about plaintiff's comments at the meeting, no witness could remember any memorable level of denial by the plaintiff. As defendant Sheppard's testimony indicates:

**Q:** Okay. Now, had Mr. Dodd said anything to that point?

**A:** I honestly don't remember. At the beginning, I'm sure he wanted to know what the problem was, what the issue was, and we said that there were too many discrepancies on some of the paperwork that he'd filled out, the psychological exam for one, Municipal Police Academy application for another.

**Q:** Did he deny any of those, did he say, "Wait a minute. It's not true"?

**A:** No. He was just puzzled. I would say puzzled would be a good word.

*Defendant Sheppard's Testimony, Volume I, at 88.*

Deputy Chief Sullivan, at his deposition, likewise recollected no such denial on plaintiff's part:

**Q:** And at this point, is it fair to say that Ms. Sheppard was running the meeting?

**A:** Yes.

**Q:** And she gave him an option to either resign or he would be terminated; correct?

**A:** That's correct.

**Q:** Right. And what did Mr. Dodd do or say?

**A:** I don't remember him responding. I don't recall him responding.

**Q:** Is it fair to say he appeared to be in shock?

**A:** I'm sure he was, yeah.

**Q:** Do you remember anything he said at that meeting?

**A:** Yes, I do recall when he—I'm not sure if it's when he came back in or prior to him leaving but I believe I asked him the question about the suspended license charge in South Kingstown and he indicated that he was not aware that that was an arrestable offense until he was on his FTO with Officer Bouthillette.

**Q:** Okay. Did anyone ask him at that time, were you taken into custody?

**A:** No.

**Q:** Okay. And you said arrestable offense. Certainly it's an arrestable offense but did anybody ask him, were you arrested?

**A:** No, no.

**Q:** Well, other than that comment, do you recall anything else that was discussed at the meeting that appeared to give Mr. Dodd an opportunity to explain what appeared to be—at least from the town's point of view—discrepancies that had been set forth in Dr. Gallagher's report?

**A:** I don't recall. I mean, I don't recall the whole meeting.

*Deputy Chief Sullivan's Deposition, Exhibit 20, at 84-86.*

Even the plaintiff could not testify within any certainty about any type of prolonged challenge to the allegations:

**Q:** All right. Now, up to that point, had you said anything at the meeting?

**A:** I was not given the opportunity, sir.

**Q:** Okay. Well, when you say that, someone or most of the people in that room had accused you of being untruthful, correct?

**A:** Yes, sir.

**Q:** Had attacked your credibility?

**A:** Yes, sir.

**Q:** What opportunity did you need other than saying, "Hey, wait a minute. This isn't right. I didn't lie. Show me. What are you talking about?"

[objection overruled]

**A:** Again, sir, it was—I was being talked to by superior officers and people of stature within the town. It wasn't my right to actually address them in that way. I did ask several times how did I lie.

Q: You did ask several times what?

A: How did I lie. Which way did I lie.

Q: All right. I didn't understand that from your direct testimony. So you did ask them, "How did I lie"?

A: Yes, sir.

Q: Okay. And they didn't give you specific answers. They just said you did, right?

A: Pretty much, sir, yes.

Q: And did you say, "That's not good enough. I need to know exactly where I lied"?

A: No, sir, I didn't.

Q: Okay. You were excused from the meeting. You came back into the meeting, and did Ms. Sheppard continue speaking at that point?

A: Off and on, yes, sir.

Q: All right. Now, did you deny any of the charges, unspecified or not while at that meeting?

A: Yes, sir, I did.

[objection withdrawn]

Q: How is it that you denied the charges? Did you say, "You're not right"? What did you say?

A: Ms. Sheppard, at one point in time, said that I had lied to URI psychological facility and told them that I had never had a bankruptcy or a foreclosure. At that point in time, I said I hadn't had a bankruptcy or foreclosure, and she said right.

Q: Other than that, did you deny anything else?

A: I wasn't really afforded the opportunity to deny anything, sir.

**Q:** Okay. Well, when you're in the meeting and people are attacking your credibility, what you're saying is you weren't afforded the opportunity to say "That's not right. You're wrong." You didn't blurt that out, correct?

**A:** Correct sir. I said several occasions "I did not lie," but that was the most that I was allowed to say.

**Q:** So on some occasions you did say "I did not lie"?

**A:** Correct, sir.

*Plaintiff's Testimony, Volume I, at 170-172.*

Interestingly, on direct examination the plaintiff's recall of the meeting and his comments were different:

**Q:** What was the next thing that happened at the meeting?

**A:** Ms. Sheppard referenced to the URI Testing that I had lied about my name and had suggested that I had changed my name to cover up things that I had done wrong.

**Q:** And in response to that comment, did you say anything?

**A:** Yes, sir, I did.

**Q:** What did you say?

**A:** I told her that if I was going to choose a name to cover up wrongdoing, I would have chosen a different name besides my grandfather's.

**Q:** Did she say anything to that?

**A:** No, sir.

**Q:** Did you say anything else other than that?

**A:** No, sir.

*Plaintiff's Testimony, Volume I, at 154.*

Plaintiff excuses his lack of denial or protest on two facts. First, that he was stunned. Second, that he was used to a chain of command atmosphere and so acted consistently subordinate to his superiors. Defendants submit that these excuses lack credible merit.

Any person's natural reaction to a question of their personal integrity or honesty, if untrue, would be to voice some opposition. Here, the least form of opposition would be the plaintiff's refusal to resign. Plaintiff's conduct at the hearing demonstrates his clear choice to accept the better of two evils—the resignation. Plaintiff's resignation letter (Exhibit 23) bears this out. The plaintiff actually apologizes in the letter for "any inconvenience" then promises to extend courtesies to the department. This is hardly supportive of the plaintiff's claimed reluctance to resign.

Plaintiff's testimony that he was not given a choice between resigning and being terminated is simply false. His own letter, attempting to revoke his resignation (Exhibit 24) clearly refutes his testimony at trial. The letter states, "I was given two choices by those in attendance. First, I would be terminated from employment or second I could submit my resignation." *Exhibit 24.* Conversely, his testimony at trial was as follows:

> **Q:** It's your testimony that you didn't elect to resign. You were told to resign; is that right?
>
> **A:** Yes, sir, it is.

*Plaintiff's Testimony, Volume I, at 172.*

> **Q:** When they came back in, what happened?
>
> **A:** They took their seats at the table, and there was a brief discussion amongst everybody, mostly from the chief and the town administrator, and at that point in time, Ms. Sheppard instructed that I was going to be let go, and she told me she wanted my immediate resignation.

**Q:** So she told you that you were going to be let go and that she wanted your resignation?

**A:** Yes, sir.

**Q:** Did she give you a choice, or is that how she put it?

**A:** That's how she put it, sir.

*Plaintiff's Testimony, Volume I, at 156-157.*

At trial, when confronted with his own words written one day after the meeting, plaintiff did not retract his testimony. Instead, he attempted an impossible reconciliation of the two:

**Q:** Then you go on and say, "I was given two choices by those in attendance. First, I would be terminated from employment; or second, I could submit my resignation." Is that a true statement?

**A:** To some extent, yes, sir.

**Q:** To some extent? Is there something not truthful about it?

**A:** Yes, it is, sir. I'm sorry.

**Q:** What is it? What's not truthful about it?

**A:** No, I was in agreement with you, sir.

**Q:** It's true?

**A:** Yes, sir.

**Q:** The reason I ask is that yesterday you said you weren't given a choice. You said you were told to resign, am I correct?

**A:** Yes, sir.

**Q:** So which is it?

**A:** I was told to resign. I was told I was going to be let go, and I was told at that time she wanted my immediate resignation.

**Q:** Why did you write this letter that "I was given two choices by those in attendance. First, I would be terminated from employment; or second, I could submit my resignation"?

**A:** Probably to explain the option that I wanted to be fired instead of resigning, an option I didn't understand I had the day before.

**Q:** Okay. I just want to be clear. You weren't given two choices according to your testimony, right? The town administrator said, "You are going to resign"?

**A:** Yes. She said she expected my immediate resignation.

**Q:** Okay. I don't want to belabor it. Were you given two choices, either resign or terminate or not?

**A:** In afterthought, the choices were there. During that meeting, I would have to say no.

**Q:** So during the meeting, you weren't given it, but when you wrote the letter, you did have them?

**A:** Yes, sir. When I was afforded counsel, then I understood that there was a choice at that time, but I did not understand that choice to be there during the meeting.

**Q:** Did you have counsel when you wrote this?

**A:** Well, I had the help of my uncle, Edward Dodd, who had been a firefighter for 20 years, and he had experienced similar problems.

**Q:** And your uncle said you were given two choices?

**A:** No, sir. He said it's usually a tactic that most people use to order the resignation. That way they couldn't be sued afterwards for being wrongful termination.

**Q:** My last question is did Sue Sheppard say to you, "You have two choices. One, you resign; or two, I'll terminate you"?

**A:** No, sir, she didn't say it like that.

*Plaintiff's Testimony, Volume II, at 5-7.*

Defendants submit that plaintiff's testimony is simply not credible.

As stated in defendants' pre-trial memorandum, there is a presumption that employee resignations are voluntary. *Leheny vs. City of Pittsburg, 183 F.3d 220, 227 (3rd Cir. 1998)* It is the plaintiff's burden to present evidence to establish that his resignation was involuntarily procured by demonstrating coercion or duress or by demonstrating that the resignation was obtained by receiving or misrepresenting material facts to the employee. *Id. at 228.*

Plaintiff did not present any evidence to indicate that defendants deceived or misrepresented matters causing him to resign. The evidence demonstrated that the plaintiff was told why his employment was in jeopardy and that he had a choice of resignation.

> **Q:** Now you've already discussed your meeting with Chief Kells. Tell us what happened as soon as the meeting occurred with everyone else in it at around four o'clock?
>
> **A:** As soon as we got into the room, Chief Kells began the meeting. As I remember, he started to talk about the lying on the exam and lying— not on the exam, lying on the— the discrepancies in the psychological exams and so on. Then at that point, he was kind of hedging, if I remember correctly, and then I kind of jumped in and said that there are two options here, either he needed to resign or he would be terminated…

*Defendant Sheppard's Testimony, Volume I, at 85-86.*

The plaintiff then made a voluntary choice to resign. Defendants submit that the plaintiff had a reasonable time within which to choose between resignation and termination. The deposition testimony of Deputy Chief Sullivan (introduced as Exhibit 20) is relevant on this issue:

> **Q:** Did he do his letter of resignation before he went to his house or after?
>
> **A:** After he went to his house.

**Q:** So he goes to his house, he comes back and then to your knowledge he does his letter of resignation?

**A:** That's correct.

**Q:** Did he do his letter of resignation before or after he spoke with then Officer McRoberts?

**A:** After he spoke to Officer McRoberts.

**Q:** How long did he speak with Officer McRoberts?

**A:** I believe it was anywhere between thirty minutes or forty minutes. I wasn't really watching the clock.

*Deputy Chief Sullivan's Deposition, Exhibit 20, at 92.*

Defendants submit that the plaintiff had ample time to reconsider his choice and to discuss the situation with a peer support officer before he submitted his resignation letter.

For these reasons, defendants submit that plaintiff's resignation was voluntary, which ends any further analysis regarding a property interest.

### 2. *As a Probationary Employee, Plaintiff Nevertheless Lacked a Constitutionally Protected Property Interest.*

Defendants' argument and position that plaintiff, as a probationary employee, lacked a constitutionally protected property interest has not changed by any of the testimony. At trial, defendant Sheppard indicated that she believed she had the ability to terminate the plaintiff under either charter provision C6-6(1) or C9-1:

**Q:** He didn't make a recommendation that he be terminated?

**A:** That's right. Therefore, for the good of the service, under 6-6.1—you can use more than one section of the charter, in my opinion.

**Q:** Okay. So now, did you use Article 6, Article 9 or both sections?

**A:** Both.

[objection sustained]

**Q:** A few minutes ago the very first question after the recess is "What section did you use?"

**A:** You asked me which section I used to dismiss him, and I used Section 9 to dismiss him.

**Q:** And now, maybe I misunderstood, but I thought in response to my last question you said you used both?

**A:** At the end of the day, I did use both. But in the beginning, the reason for the dismissal in the first place of Section 9, probationary officer, and I feel that the town administrator has the right to discharge under that particular section, and it never occurred to me that the chief of police would not agree.

But since the chief of police didn't agree, then comes 6.6 which says "for the good of the service."

*Defendant Sheppard's Testimony, Volume I, at 65-66.*

As stated in the pre-trial memorandum of law, whether the Town Administrator perceived she had authority from charter provision C6-6(1) is not material because it does not override or supersede the plain language of the charter itself. Defendants will not restate but instead rely on their second argument that even if section C6-6 governed plaintiff's removal, that section in itself does not create a property interest.

### *3. Liberty Interest*

Since plaintiff's counsel has notified the defendants that the plaintiff is not pressing this claim, defendants will not analyze any testimony on this point or further brief the issue.

### B. Substantive Due Process

In their pre-trial memorandum, defendants challenge the plaintiff's claim of due process on two grounds. First, that their actions did not "shock the conscious" and, second, that there is not an "identifiable liberty or property interest" actionable under the substantive modality of the due process clause. The trial testimony supported both positions. The Town Administrator indicated that she became convinced that the plaintiff could no longer be employed after receiving a phone call and follow-up letter from Dr. Gallagher. *(Letter from Dr. Gallagher dated August 10, 2005, Exhibit 2)* Dr. Gallagher's letter outlined a number of concerns including the plaintiff's integrity. At trial, Dr. Gallagher indicated that she informed the Town Administrator that the plaintiff's psychological rating was "invalid":

**Q:** Going back to Exhibit 9, I'll put the first page on, you've already identified that as the test result from the Lincoln application, correct?

**A:** Correct.

**Q:** He received a satisfactory rating of three, correct?

**A:** Correct.

**Q:** You've already indicated that that rating is invalid; is that right?

**A:** That's correct.

**Q:** And you so communicated that to Ms. Sheppard?

**A:** That's correct.

*Dr. Gallagher's Testimony, Volume III, at 58.*

Under these circumstances, the conduct of the Town Administrator cannot be placed in the category of conscious-shocking. She clearly determined—and still does—that the plaintiff had misrepresented facts during his application process. Defendant Sheppard was informed by

Deputy Chief Sullivan that the plaintiff's lack of candor could affect his ability to testify as a police officer rendering his function as an officer, at the very least, incomplete.

> **Q:** You were notified by Dr. Gallagher on August 10th, and you then asked Deputy Chief Sullivan to find out some additional information, correct?
>
> **A:** Correct.
>
> **Q:** Did Deputy Chief Sullivan bring up an issue that I will call a Giglio issue?
>
> **A:** Yes, he did.
>
> **Q:** Were you aware of what a Giglio issue was before he brought it up?
>
> **A:** No, I was not.
>
> **Q:** Okay. And we have his deposition and he's going to testify, but was the Giglio issue something that you factored into your determination?
>
> **A:** Absolutely.
>
> **Q:** And what was your understanding, after you spoke with him, about this Giglio issue?
>
> **A:** My understanding of it is that if a police officer has a Giglio issue, which means that he lied before at some other point in time, he basically becomes ineffective as a police officer. So you put on a police officer with 20 years of service and this person can really never testify in any cases, so the person is useless to the police department.
>
> **Q:** Did Deputy Chief Sullivan give you some materials on that?
>
> **A:** He did.
>
> **Q:** And did you review them?
>
> **A:** I reviewed them.

*Defendant Sheppard's Testimony, Volume I, at 81-82.*

This testimony is supported by the testimony of Deputy Chief Sullivan:

**Q:** At the time that you delivered them to her, in addition to giving them to her, did you have any discussions about what you had gleaned from those documents?

**A:** I explained to her or I told her that I had some concerns that this possibly could be a Giglio issue.

**Q:** Okay. What did you – when you say it could be a Giglio issue, first let me ask you this, what did you understand—have you ever read the Giglio case, by the way?

**A:** I have not read the entire case, no.

**Q:** What did you understand the "Giglio" issue to be?

**A:** If a witness has been found to be untruthful, then that information has to be passed on. The credibility has to be passed on to the prosecution, the defense. I'm sorry, by the prosecution. And that could affect any testimony that person is involved with.

*Deputy Chief Sullivan's Deposition, Exhibit 20, at 67-68.*

Therefore, the Town Administrator clearly believed that the plaintiff could not completely function as a police officer because he could not be a credible witness in any criminal case. The department in such cases would be required to advise the defendants' counsel of the facts of the officer's lack of credibility. This reasoning alone, whether accepted or not, is sufficient to undermine any claim that the plaintiff's severance from employment fits within the category of "conscious-shocking."

**C. Qualified Immunity**

The testimony of Town Administrator Sue Sheppard demonstrates that it was not reasonable for a similarly situated official to have understood that the conduct contravened the

clearly established law. Specifically, she testified that she believed that as the Town Administrator she had the ability to terminate a probationary employee at any time:

> **Q:** Did you feel that there was some sort of a timing issue regarding when Mr. Dodd could and should be terminated?
>
> **A:** I'm not sure what you mean by "timing issue."
>
> **Q:** Could you have waited a year or two and then made a decision?
>
> **A:** No.
>
> **Q:** What was the reason for that?
>
> **A:** He was on probation.
>
> **Q:** Did that—did his probationary status—apart from whether or not you could terminate him because of his—I'll withdraw that. That doesn't make sense.
> You were cognizant of the fact of when his probation ended?
>
> **A:** I was cognizant of that. Can I expound a little bit?
>
> **Q:** Sure.
>
> **A:** I was also cognizant of the fact that because of this issue and because there were—I was cognizant that this was an integrity issue that needed to be taken care of right away. I knew that we couldn't wait another month. I knew that it had to be done right away.

*Defendant Sheppard's Testimony, Volume I, at 92-93.*

Of course, a significant portion of this trial is devoted to the issue of whether the plaintiff could be terminated as a result of his probationary status. At the very least, defendants submit that this issue is not so "clear" such that the Town Administrator would have understood that her conduct "contravened the clearly established law." *Savard vs. R.I., 338 F.3d 23, 27 (1st Cir. 2003).*

**D. Article VI of the Town Charter**

As previously stated at trial, the Town Administrator indicated that she utilized two charter provisions in her determination that the plaintiff should be terminated. However, defendants' argument has not changed that the plaintiff cannot claim any protection that may or may not emanate from this charter provision.

**E. Article IX of the Town Charter**

The testimony of Dr. Gallagher supports the position of the defendants that the plaintiff is and was at the time, ineligible for appointment as a permanent police officer for the Town of Lincoln. Consequently, the Town Administrator did not need the recommendation of the Chief of Police in order to make this determination. As stated in defendants' pre-trial memorandum of law, section 9-1(2) provides that:

> All police officers below the rank of Chief of Police shall be appointed or promoted as the case may be by the Town Administrator upon the recommendation of said Chief *provided they shall have satisfactory passed such quality tests as the Town Council shall have established by ordinance*. (*Emphasis added.*)

Although introduced as an exhibit (Exhibit 27) the Court can take judicial notice of ordinance 44-2, which requires a Lincoln police officer to pass a psychiatric examination.

Dr. Gallagher testified that the plaintiff's responses on his personal history form for his Lincoln psychological examination were not true and thus rendered his rating as invalid. Hence, if the plaintiff's psychiatric examination for Lincoln is invalid, the plaintiff could not be appointed as a permanent police officer whether the Chief of Police recommended it or not.

There is a second reason underscoring the importance of Dr. Gallagher's finding that the test results are invalid. Defendants submit that the plaintiff is not qualified, at this point, to

receive the relief he requests. Defendants submit that the plaintiff cannot be placed on the police force because he does not qualify under the law. Rhode Island General Law section 42-28.3-1 mandates that any candidate receiving an unsatisfactory rating is ineligible for the position of a police officer. At best, with his Lincoln rating invalid, the plaintiff simply does not have any psychological rating:

> **The Court:** So the first question is just a yes or no question. Do you have an opinion whether he is fit, psychologically fit to be a police officer today? You may have an opinion. You may not have an opinion. We just want to know yes or no.
>
> **The Witness:** I don't have an opinion, no.
>
> **The Court:** Okay.
>
> **Q:** The next question is why don't you have an opinion?
>
> [objection overruled]
>
> **A:** Because the psychological is valid for one year, and this psychological is now a year old.
>
> **Q:** And you've also indicated that it's invalid?
>
> **A:** Correct.
>
> **Q:** So that's of no use to you?
>
> **A:** Right. Exactly.

*Dr. Gallagher's Testimony, Volume III, at 59-60.*

Since Dr. Gallagher's testimony is crucial on these points, defendants will analyze the bases for her conclusion. Exhibit 16A is the plaintiff's personal history form submitted as part of the requirements for the psychological examination for Lincoln. Dr. Gallagher determined that

plaintiff was less than forthcoming on some of his responses in this document and was outright untruthful on others.

The first entry in question concerns that portion of the form that asks the plaintiff to indicate "alias-other name." The plaintiff left this entry blank. Dr. Gallagher testified that this response was less than forthcoming. It should be noted that in the earlier Pawtucket application (Exhibit 15B), the plaintiff did not leave a similar question unmarked. Instead, he put "N/A". His failure to fill out this entry seems, at the very least, calculated. At trial, it was demonstrated that in other forms and documents, the plaintiff indicated that he was formerly known as Samuel Apkarian.

Dr. Gallagher pointed out that the plaintiff was not truthful in his response to the question "Have you ever failed a public safety psychological evaluation." On the form, plaintiff indicated "Not to my knowledge." Dr. Gallagher determined and the defendants submit that the plaintiff knew that he had not passed an earlier psychological examination. Pawtucket Police Captain Moreau, an official from Pawtucket, who was in charge of the recruiting and application process for Pawtucket, testified directly that he told the plaintiff that he had not passed the psychological examination. In addition, the letter the plaintiff received from the City of Pawtucket two days after taking the final portion of the psychological examination for Pawtucket (Exhibit 15C) indicates that "based on the State requirements for the police academy" he was no longer being considered for the upcoming Rhode Island Municipal Police Academy.

When asked what other State requirements besides the psychological examination the plaintiff had taken, he could not respond:

**Q:** If you look at Exhibit 15, it says "This is to inform you that based on the state requirements for the police academy, you are no longer being considered," doesn't it?

**A:** Yes, sir.

**Q:** What other state requirements had you taken other than a psychological examination?

**A:** Departmental sponsorship, sir.

**Q:** Well, other than a departmental sponsorship, were there any other State requirements?

**A:** Besides those two, I couldn't tell you.

**Q:** All right. And you say departmental sponsorship is a state requirement. Why do you say that's a state requirement? If the department wants you, they tell you that you're in, isn't that right?

**A:** Yes, sir, I guess so.

**Q:** Okay. My question to you is you receive a letter two days after a psychological interview telling you that you're no longer being considered. Didn't that give you some indication that perhaps you didn't have a satisfactory rating on your psychological examination?

**A:** No, sir.

*Plaintiff's Testimony, Volume I, at 185.*

The plaintiff's testimony as to the reason he felt Pawtucket did not hire him seems contrived at best. He certainly made no inquiries after receiving the letter.

There seems to be no question that the plaintiff's answer to whether he had ever been stopped by the police was wrong. Plaintiff gave the answer of "None." Again, plaintiff's excuse for this answer (that he didn't read it correctly and felt it was the same question asked by the training academy) again seems contrived at best.

**Q:** Now, you do not dispute that on your second personal history form for the URI testing facility that you answered one of the questions incorrectly, right?

**A:** Correct, sir.

**Mr. DeSisto:** This has already been marked as a full exhibit, 16A.

**Q:** I'm going to show you the second page of it. And it says, "List all legal difficulties relating to both adult and juvenile arrests, dropped charges and expunged records including being stopped by police, traffic violations, arrests, domestic violations, citations, et cetera." Your response was none, right?

**A:** Correct, sir.

**Q:** Was that a truthful answer?

**A:** It was not an accurate answer.

**Q:** Okay. In fact, you have been stopped a number of times for speeding and we've gone through that, right?

**A:** Correct, sir.

* * *

**Q:** So why is it that you didn't put that in when you were asked on the Lincoln application?

**A:** I had the day before passed in the application for the academy and in consideration of a similar question that's on the academy application, I did not fully read the question on the Lincoln psychological personal interview sheet. I inaccurately answered the question because, I believe, I assumed it was the same as the question on the sheet I had filled out the previous day. I rushed through the question. I made a mistake.

*Plaintiff's Testimony, Volume I, at 201-202.*

Dr. Gallagher testified that the test rating would be impacted if information such as traffic stops was inaccurate:

**Q:** Is background information an important consideration?

**A:** Yes. I wish that it was mandated that everyone had to give it to us. And in some states, it is.

Q: Does incorrect information impact the analysis?

A: Yes.

Q: Why?

A: Because you need to have all the facts to make a valid decision. So if you do not have correct information, that can adversely impact your rating.

* * *

Q: If information is determined to be false after the rating is determined, can that have an impact on the rating?

A: Definitely.

Q: And I think it's obvious, but why is that?

A: Because that means that we didn't have all the facts at hand when we rendered our decision, and that's most unfortunate.

Q: On the personal history forms that we have viewed and I'll show you in a moment, there is a request for information which might entail history of any speeding violations or traffic violations. Are you familiar with that?

A: Yes.

Q: Is that an important background fact in making a determination concerning an applicant's rating?

A: Yes.

Q: And why is that so?

A: Well, there are scores that measure control, self-discipline, responsibility, impulsivity, all of those things. And if you have several speeding violations, those can enter into the determination of what the scores on impulsivity are actually related to from a behavioral perspective.

Q: And I suppose that it depends on the number of them and how far in the past they were or how current they are; is that correct?

A: That would be correct, as well as how many miles over the speed limit in addition to what you've just stated.

**Q:** Is it important for the rating process to have accurate information concerning traffic violations then?

**A:** Yes.

**Q:** As the Director of the URI Testing Services, do you have the authority to rescind a rating that has been given if you determine that false information has been supplied in getting to that rating?

**A:** Rescind is—I've not ever done that. The way I have acted when that happens is I contact the department and tell them in writing why it is that I feel the psychological evaluation is not valid with that rating, and I delineate that for them so that they may take appropriate action, either withdrawing the person from the academy or dismissing them from the probationary period, or whatever they feel would be appropriate.

**Q:** So if it comes to your attention that information has been supplied that's inaccurate, you have the option of declaring that rating invalid?

**A:** Yes.

**Mr. Penza:** Sorry. May I have the last question? I didn't get it. Did he say valid or invalid?

**The Reporter:** Invalid.

**Mr. Penza:** Invalid? I object to the question. That isn't what she said. The previous question—that was not her answer to the previous question.

**The Court:** Right. I understand your objection. Why don't you attempt to clarify the point Mr. DeSisto.

**Mr. DeSisto:** All right.

**Q:** If you determine, as Director of the Testing Services that a rating that was given to an applicant was based on or—let me withdraw that.
If you determine that there was incorrect information in the process, background information, and a rating was given, do you declare that that rating—do you declare to the sponsoring agency that that rating is invalid?

**A:** It's not valid.

**Q:** And you tell the sponsoring agency that?

**A:** Yes.

*Dr. Gallagher's Testimony, Volume III, at 35-38.*

Similarly, the plaintiff was not truthful regarding any counseling. At trial he admitted that he had one session of counseling. Moreover, this became an issue in his Pawtucket examination as testified to by Dr. Gallagher.

**Q:** All right. And as a result of that mental status exam, did you learn anything different or new?

**A:** Yes.

**Q:** What was that?

**A:** He had—Mr. Dodd had been asked on the personal history form whether or not he had ever obtained any type of mental health counseling or treatment in the past or currently, and he had indicated he had not. Dr. Wrobel had also asked that on his mental status examination. And when I asked Mr. Dodd, he—and he had said no to Dr. Wrobel. And when I asked Mr. Dodd, he said that he had, in fact, seen a counselor at his father's request sometime when he was in the 10th grade. His father had wanted him to see somebody to help him deal with the transition for moving from New Hampshire to Rhode Island.

**Q:** And did you discuss with Mr. Dodd whether or not he should have disclosed that earlier than with you?

**A:** They way I elicited that information, because Dr. Wrobel had said he had such difficulty getting information from Mr. Dodd, is I remember saying that, you know, have you ever, ever, ever at any time had any mental health treatment. And it was with that intimation and that level of communication that he provided that information.

*Dr. Gallagher's Testimony, Volume III, at 44-45.*

These four responses—questionable at best, untrue at worst—demonstrate that the background facts given by the plaintiff were inaccurate. Dr. Gallagher testified that any

inaccurate facts would have an impact on the overall rating. Her determination that the plaintiff's rating is therefore invalid is justified.

The consequence of an invalid rating is significant. As stated, it supports the ability of the Town Administrator to terminate the plaintiff without the recommendation of the Chief. Further, it acts as a barrier to the plaintiff's claim that he is qualified for reinstatement.

## IV. CONCLUSION

For these reasons, defendants respectfully submit that judgment should be rendered in their favor on all counts of the plaintiff's complaint.

Defendants,
By their attorney,

Marc DeSisto, Esq. (#2757)
DESISTO LAW
211 Angell Street
P.O. Box 2563
Providence, RI 02906-2563
Phone: (401) 272-4442
Fax: (401) 272-9937
Email: marc@desistolaw.com

CERTIFICATION OF SERVICE

I hereby certify that a true copy of the within was mailed, postage prepaid, on this 7th day of April 2006, to:

Joseph F. Penza, Jr., Esq. (#0607)
OLENN & PENZA, LLP
530 Greenwich Avenue
Warwick, RI 02886