JFP:pac 6964/1 \JFP\69641Post-TrialMemo.wpd

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| SAMUEL E. DODD | : | |
| | : | |
| VS. | : | C. A. NO. 05-519S |
| | : | |
| SUE P. SHEPPARD, individually and in her capacity as Town Administrator for the Town of Lincoln; and the TOWN OF LINCOLN, by and through its Treasurer, Stephen Woerner | : | *(R.I. Superior Court C.A. No. PC05-6058)* |

# PLAINTIFF'S POST-TRIAL MEMORANDUM

## I. INTRODUCTION

The plaintiff has submitted under separate cover a series of proposed findings of fact (post-trial). Counsel will rely on that document to apprise the court of his version of the facts of this case. *To the extent that facts are set forth in this memorandum which have already been cross-referenced to the trial transcript in the proposed findings of fact, reference to the trial transcript is not repeated herein.*

This post-trial memorandum is being submitted to supplement the plaintiff's pre-trial memorandum as well as respond to those issues/arguments raised by the defendants in their pre-trial memorandum. Counsel will not reiterate the points of law made in plaintiff's pre-trial memorandum, and so in that context, plaintiff incorporates by reference the legal arguments raised therein. For the court's convenience, a copy of this pre-trial memorandum is attached.

## II. LEGAL ARGUMENT

### 1. Introduction

While plaintiff only referenced two legal theories in his pre-trial memorandum, in actuality, there are five legal theories set forth in his complaint. Two of the theories relate to state

law claims while the other three theories relate to federal constitutional claims. Two of those constitutional claims were addressed in the plaintiff's pre-trial memorandum (i.e. procedural due process and substantive due process). Neither of the state claims or plaintiff's constitutional claim for a name-clearing hearing were addressed in the pre-trial memorandum. Although there is an obvious overlapping between the state and federal claims, the specific state law claims will be addressed herein. Counsel has advised the defendants' attorney that he does not intend to press his constitutional name-clearing claim (Count III).

## 2. Plaintiff's State Law Claim—Article IX of Town Charter

In Count I of the plaintiff's complaint, he has alleged that the town administrator failed to follow the proper procedure in terminating him under Article IX of the Town Charter. The pertinent section of the Town Charter provides that probationary police officers "may be removed at any time by the town administrator **upon recommendation of the chief of police** with or without cause." (emphasis added)

To prevail under this state law claim, it is <u>not</u> necessary for Dodd to prove that he had any property interest in his job. Rather, plaintiff need only establish that the town administrator was without authority to fire him under Article IX of the Town Charter. That has clearly been proven. It is undisputed that the chief never recommended that Dodd be removed. In fact, the chief should be applauded for his action (or actually his lack of action) with respect to this entire matter. Unlike Dr. Gallagher and Sheppard, Chief Kells was not interested in making a rush to judgment. Without the benefit of examining back-up information and giving Dodd an opportunity to explain perceived discrepancies, Kells testified that he could not support Sheppard's decision to terminate Dodd.

Defendants contend in their pre-trial memorandum that notwithstanding the language of "upon recommendation of the chief," that the town administrator still had the right to terminate Dodd under Article IX. To interpret the charter in such a fashion would violate a basic tenet of statutory interpretation.

> When the language of a statute, or, correspondingly a charter, is clear and unambiguous, we interpret the statute literally and give the words their plain and ordinary meaning. (citation omitted)

*Kells* at 213. See also *Farone v. City of Providence*, 935 F.Supp. 82 (D.R.I. 1996); *State v. Badessa*, 869 A.2d 61 (R.I. 2005); *McCarthy v. Environmental Transp. Services, Inc.*, 865 A.2d 1056 (R.I. 2005); *In re Advisory Opinion to Governor*, 856 A.2d 320 (R.I. 2004).

Defendants also argue that Section 9-1(2) mandates that police officers pass tests established by ordinance. Exhibit 27 reveals that the prerequisite to becoming a police officer is that one must pass "a rigid physical and psychiatric examination." Notwithstanding the defendants' argument in their pre-trial memorandum, Dodd had not failed the Lincoln psychiatric evaluation. Dr. Gallagher testified that in her opinion, based on what she believed to be erroneous information, that Dodd's psychologic evaluation was "flawed" or "invalid." She could not opine as to whether or not Dodd was a suitable candidate to be a police officer. Moreover, none of that matters in the context of what power the town administrator has under Article IX. The language is loud and clear. If the police chief does not recommend a probationary officer should be terminated, the town administrator has no power **under that particular section of the Charter.**[1]

### 3. Plaintiff's State Law Claim—Article VI of the Town Charter

Count II of plaintiff's complaint is another state law claim under which plaintiff should prevail even if this court finds that Dodd had no property interest in his job. As opposed to the constitutional theory (which would require the court to find a property interest), this count of the complaint is predicated on the town administrator's authority to terminate someone under Article VI of the Town Charter. Just as was the case with respect to the town administrator's authority under Article IX, she woefully failed to meet the mandates of Article VI in terminating Dodd.

---

[1] This is not to say that the town administrator's hands would be tied. This is the very reason why the town administrator had the ability to terminate Dodd under Article VI—provided, of course, she followed the requirements thereunder.

The specific wording in Section 6-6(1) is significant particularly if the court is troubled by whether or not Dodd has a right to have the town administrator establish "for cause" even though he is a probationary officer. The defendants have taken the position that the town administrator could utilize Article VI in terminating Dodd but need not establish "for cause" because Dodd is a probationary officer. However, a closer examination of Section 6-6(1) reveals that those who drafted the charter knew exactly what they were doing in a situation dealing with probationary employees. First and foremost, there is no distinction between probationary and non-probationary employees in Article VI. Secondly, the section in question under Article VI provides that the town administrator "for the good of the services" (which has been interpreted by the Rhode Island Supreme Court in both *Kells* and *Stewart* as meaning "for cause") can remove employees of the town "**except as otherwise provided by this Charter.**" In the context of this case, what that means is that if there is another place in the charter that provides for the termination of an employee without cause, then that can be used. (See *Kells* at 212—"when confronted with statutory provisions that are *pari materia*, the court will construe them in a manner that attempts to harmonize them.") In the case at bar, the town administrator could indeed have used Article IX of the charter which would not have required a showing of for cause **provided** she had the recommendation of the chief of police. However, since there was no such recommendation, then she could not use Article IX and was forced to use Article VI which requires "for cause."

As established in *Kells* and *Stewart*, a showing for cause entitles an employee to a specification of the charges, due notice of a hearing and an opportunity to be heard. It is undisputed that none of those prerequisites were provided to Dodd. In fact, just the opposite is true. Notwithstanding Sheppard's testimony that she "agonized for a week," [redacted] the fact of the matter is within three days after receiving all of the documents she utilized in making her decision (see proposed findings of fact #s 26 and 27), she made an irrevocable decision to terminate Dodd. She made it clear from the witness stand that there was nothing that Dodd could have presented that would have changed her mind. She was adamant that even if Dodd presented evidence that all of the bases she used in terminating him were either false or erroneous, that her decision was set in stone and that

he would be terminated. It did not even matter to her that Dodd may have been telling the truth! [redacted]

Furthering the theory that the charter should be read in *pari materia* is the fact that under §14-7 of the charter, probationary employees can only be dismissed **for cause.**

> All original appointments...to the classified service shall be for a probationary period of six months...Any employee may be dismissed by the appointing authority **during the probationary period** for reasons relating to the employee's qualification or **for the good of the service** stated by the appointing authority in writing and filed with the Personnel Board. (emphasis added)

The natural question to ask is whether police officers are member of the "classified service" and thus protected by §14-7. The answer to that question can be found in §14-4 which lists individuals who are <u>not</u> part of the "classified service." The list does <u>not</u> include police officers. Therefore, the conclusion is inescapable—probationary police officers are protected by §14-7. They are entitled to all the protections afforded employees under Article VI.

**4. Plaintiff's Constitutional Claim—Violation of Procedural Due Process**

Plaintiff would refer the court to pages 1 through 4 of his pre-trial memorandum for the major points of this argument. Plaintiff intends to address in this portion of his post-trial memorandum the arguments raised by the defendants in their pre-trial memorandum.

**(a) The plaintiff's purported "resignation."**

Defendants first argue that even if the plaintiff had a property interest in his job, he waived such interest by resigning from his position. Such an argument is without merit in light of the fact that Dodd was never given a choice and, to the extent that he had such a choice, it was not a real one.

Dodd testified that at the meeting on August 24, 2005, he was told that he was going to be fired and the town administrator wanted his resignation. Later, when he asked the deputy chief if he could go home before presenting his letter of resignation, he was told that the town administrator was expecting his "immediate resignation." Sheppard never really disputed the fact that Dodd had no choice but to resign. It was clear from her testimony that she had made up her mind as early as August 19, 2005 that Dodd would be terminated and that nothing could change her position in that regard.

Deputy Chief Sullivan testified (via deposition) that he believed that Dodd prepared the letter of resignation after Dodd had gone home to retrieve the police department's belongings and after he had spoken to Officer McRoberts. However, contrary to Dodd who testified on cross-examination that he had a very clear recollection of what transpired after he had been terminated [redacted], it is apparent that Deputy Chief Sullivan did not have such a good recollection of the events of August 24, 2005. He testified that he could not recall what was said during the termination meeting and could not even remember the general content of what was discussed. [redacted]

Whether the court adopts Dodd's time line of the post-termination events or Deputy Chief Sullivan's time line, the fact of the matter is Dodd was given no more than one hour to submit his resignation. These facts are significantly different than those in the cases relied upon by the defendants.

In *Leheny v. City of Pittsburgh*, 183 F.3d 220 (3rd Cir. 1998), the issue was whether or not police officers had voluntarily resigned and thus had given up their property interest in their employment and retirement benefits. One of the arguments raised by the retirees was that they signed an agreement (which in effect led to their resignation) based on misrepresentations set forth in the cover letter which accompanied the agreement. Thus, they argued that their due process rights were violated because the letter "coerced" them into retiring. The court rejected the argument for the simple reason that the retirees had already decided to retire four months before the letter had been

sent. In addition, the court noted that the retirees had 10 days to investigate the implications of their refusing to sign the agreement and also to seek the advice of a union representative concerning available grievance procedures if they chose not to sign the agreement. In the case at bar, Dodd had no such protection. Under his version of the events, he had 10 minutes (as opposed to 10 days) to submit his letter of resignation. Unlike the facts in *Leheny*, he did not have the opportunity to seek the advice of a union representative as to what his options were.

The case of *Nunn v. Lynch*, 113 Fed. Appx. 55 (6th Cir. 2004), is also distinguishable from the case at bar. In that case, the plaintiff (Nunn) had resigned from his job. In attempting to argue that he still had a property interest, Nunn argued that he had been constructively discharged—i.e. that his resignation was not voluntary. In quoting *Leheny*, the court noted the two circumstances in which an employee's resignation will be deemed involuntary for due process purposes: (1) when the employer forces the resignation by coercion or duress, or (2) when the employer obtains the resignation by deceiving or misrepresenting a material fact to the employee. Nunn was alleging that he had been constructively discharged and, thus, forced to resign. However, the acts that he was alleging that amounted to a constructive discharge—giving a negative and false evaluation, criticizing him in public, treating him in a disrespectful manner, and giving him undesirable office space—all occurred over an extended period of time. Moreover, the supervisor who allegedly caused all of the foregoing problems ceased being his supervisor 10 days before Nunn had filed his resignation. As the court noted, how could a reasonable person feel compelled to resign after the cause of the difficult working conditions had already left? The court concluded that Nunn could not overcome the presumption that his resignation was voluntary.

In this case, Dodd met both tests referenced in *Nunn* to overcome the presumption that his resignation was voluntary. First, Dodd was not given any choice. He was told by the town administrator that she expected his immediate resignation. In short, he was coerced into retiring. Second, Dodd should have been apprised that he was entitled to an enumeration of the charges, an opportunity to be heard and to present evidence in his defense (pursuant to the teachings

in *Kells* and *Stewart*). Instead, Dodd was led to believe that he had no choice. Thus, the resignation was obtained by misrepresenting a material fact (i.e. his right to a hearing).

Defendants further rely on *Terban v. Department of Energy*, 216 F.3d 1021 (Fed. Cir. 2000). In that case, Terban applied for a voluntary separation incentive plan which was then being offered to eligible employees of the defendant. Shortly thereafter, he took a four-month period of approved leave. While on that leave, Terban was informed that the defendant had approved his buy-out application and his desired separation date. Before the separation date, Terban inquired as to whether he had the option of withdrawing his retirement application if he wished to do so. He was told that he could withdraw his application any time prior to the effective date of his retirement. He never withdrew his application and he retired in October of 1997. Almost nine months thereafter, Terban filed an appeal alleging that his retirement had been "involuntary." He used the same argument that Nunn had used—i.e. the defendant had made his working conditions so intolerable that he had been constructively discharged. Terban was basing his allegation on the fact that he had heard from co-workers that if he withdrew his retirement application, his four-month approved leave with pay, would be transferred to leave without pay and thus, he would have been responsible to pay back the company. In addition, he noted a couple of unpleasant experiences with his immediate supervisor. The court noted that since he was unable to establish any precipitating event that occurred relatively close in time to his retirement which would have given a reasonable employee no choice but to retire, his claim of coerced retirement had to fail. Again, the facts in *Terban* are clearly distinguishable from the case at bar.

**(b) Rebutting defendants' contention that plaintiff had no property interest.**

Defendants argue that even if Article VI of the Town Charter governed Dodd's employment, that section does not create a constitutionally protected property interest. In support of this position, defendants have cited *Bennett v. Boston*, 869 F.2d 19 (1st Cir. 1989). The defendants' reliance on *Bennett* is misplaced. In that case, the plaintiff's provisional employment kept getting extended for three months at a time. When Bennett was finally terminated because of a criminal charge, he sued claiming that he had a constitutionally protected property interest in his job and

utilized the collective bargaining agreement to support his position. The collective bargaining agreement in question provided that no employee who had completed six months of service could be discharged except for just cause. As noted by the defendants, the court held that the use of the words "for cause" does not always transform a job into a protected property interest. Rather, the focus is what the employee's legitimate expectation is relative to continued employment. The court in *Bennett* noted that the very next section in the collective bargaining agreement following the one Bennett was relying on made clear that Bennett did not have a legitimate expectation for continued employment. Such is not the case in Dodd's situation.

While it is true that Dodd could have been dismissed without cause under Article IX of the charter, that section required the recommendation of the chief of police. Thus, Dodd's expectation was that the chief, who had the ability to review his performance as a police officer, could in fact recommend to the town administrator that he be terminated and in such case, Dodd did not have an expectation of any due process rights. However, since the chief did not make such a recommendation, the town administrator had to utilize Article VI of the Town Charter. Under that section of the Town Charter, Dodd's expectation was that his job was safe unless the town could establish just cause that he be terminated. [See *Cheveras Pacheco v. Rivera Gonzalez*, 809 F.2d 125, 127 (1st Cir. 1987) citing *Perry v. Sindermann*, 408 U.S. 593, 601-02 (1972)—property interests may be created not only by explicit contractual provisions but also by an implied contract or officially sanctioned rules of the workplace.]

Further buttressing Dodd's expectation is the language set forth in §14-7 of the charter (previously quoted in Section 3 of this portion of the memorandum). That section of the charter applies to Dodd and clearly spells out that unless he was being fired under Article IX of the Town Charter, he had an expectation of continued employment.[2]

---

[2] Dodd was a member of the "classified service" inasmuch as police officers are not excepted from the classified service under §14-4 of the charter.

Therefore, wrapping this up into a neat package and reading the various provisions of the charter in a consistent fashion, Dodd could have been fired without cause under Article IX provided the chief recommended the termination. If Article IX is not used (as it could not be in this case), then Article VI requires a showing of cause. Section 14-7 makes clear that the "for cause" requirement also applies to probationary employees.

**(c) The effect of Dr. Gallagher's testimony.**

Finally, with respect to plaintiff's procedural due process claim, defendants seemingly argue that Dodd would never have been hired if it were not for the faulty psychological evaluation conducted on behalf of Lincoln and, thus, he cannot claim a right to any due process. Defendants rely on the testimony of Dr. Gallagher for this position. Such reliance is faulty both from a factual and legal point of view.

On **factual grounds**, one would have to question the bases of Dr. Gallagher's opinion. It is clear that instead of focusing on what transpired during the course of the Lincoln evaluation, her main concern was what had transpired two years earlier during the course of the Pawtucket evaluation. This point was emphasized by Dr. Gallagher when she was questioned about Dodd's response of "not to my knowledge." When it was suggested that a better question would have been 'have you ever taken a psychological examination in the past?', she indicated that in fact such a question was posed to each candidate but that it appeared on a different form(s) [redacted]. Dr. Gallagher then revealed that Dodd had admitted that he had taken a previous psychological test. (See also Exhibit 28). She could not recall whether she thought about checking his answer to that question at the time she sent her letter to Sheppard because her intent was to convey that he had failed the Pawtucket test in 2003 [redacted]. Indeed, the emphasis of the Pawtucket test is highlighted throughout Gallagher's letter to Sheppard as well as her testimony in court. Once she concluded that Dodd had duped her (by not disclosing his former name) [redacted], it was clear by her actions and words that Dodd was a marked man no matter how much he may have changed in the two-year period between taking the Pawtucket test and the Lincoln test.

The defendants' argument that Dodd would not have been hired anyway is also factually suspect based on Dr. Gallagher's opinion (or lack thereof). When specifically asked whether or not she could give an opinion as to Dodd's suitability as a police officer, she said that she could not.

The Town of Lincoln's argument on this point is **legally flawed** as well. The United States Supreme Court in *Loudermill* and Judge Pettine's decision in *DelSignore* both rejected the employers' arguments along those lines. In *Loudermill*, the plaintiff was fired for lying on an application regarding a felony conviction. The defendant attempted to argue that Loudermill had no property right because had he answered the question truthfully, he would not have been hired anyway. The court rejected that contention because it made a factual assumption and, more importantly, found that the defendant could not escape its constitutional obligation by rephrasing the basis for the termination. As the court stated:

> ...the argument relies on a retrospective fiction inconsistent with the undisputed fact that Loudermill was hired and did hold the security guard job.

*Loudermill* at 539 fn 5.

In *DelSignore*, Judge Pettine rejected a similar argument made by the Town of North Providence, citing *Loudermill* and finding the language quoted above to be "squarely on point." *DelSignore* at 426.

**5. Plaintiff's Constitutional Claim—Violating Substantive Due Process**

Where procedural due process is simply a guarantee of fair procedure and focuses on the "how and when," substantive due process protects individuals against state actions which are "arbitrary and capricious," or which run counter to "the concept of ordered liberty," or those which appear "shocking or violative of universal standards of decency." *Amsden v. Moran*, 904 F.2d 748,

753 (1st Cir. 1990).[3] The reckless arbitrariness and caprice must be stunning, evidencing more than humdrum legal error. *Id.*

Dodd has met this standard in this particular case. But for the failure to list the speeding violations on Exhibit 16A, all of the underlying bases for terminating Dodd were predicated on:

- factual inaccuracies—e.g. Dodd had been arrested by South Kingstown police when in fact he had only been given a citation;

- flat out misrepresentations—e.g. Dodd had failed to disclose his credit problems when in fact they are listed on Exhibit 16A and he discussed them with Dr. Fontaine;

- a misinterpretation of the law—e.g. the need to list speeding violations on the Academy application which is a civil violation in response to a question about "convictions" and which question is preceded by a statement regarding "felonies" and "misdemeanors";

- willfully ignoring the clear language in a question—e.g. Sheppard's insistence that even though the Lincoln application asked for "convictions," that Dodd should have listed his "arrest"—even though Dodd had never been arrested; and

---

[3] While plaintiff feels he has proven that his substantive due process rights have been violated, prevailing on this issue is not necessary to in order to prevail on his procedural due process claim. As the court noted in *Loudermill*, "the right to a hearing does not depend on a demonstration of certain success" at 544, citing *Carey v. Piphus*, 435 U.S. 247, 266 (1978)).

- vagueness in the request for certain information—e.g. the need to list a former name in the block calling for "other" name and where URI officials needed a Webster's Dictionary to understand the distinction.

Of even greater significance is Sheppard's admission that she did not care what was presented to her by Dodd to rebut any of the grounds for the termination. She was going to terminate him no matter what. Such a statement was not only stunning, it was absolutely shocking. Just as she had no basis to terminate Chief Kells and Finance Director Stewart, she had no basis to terminate Dodd. Sheppard completely ignored the mandate set forth by the Rhode Island Supreme Court in her two earlier firings and simply took the position that she had the authority to terminate Dodd under either Article VI or Article IX. While she could not believe that the chief would not have "recommended" such termination once this matter was brought to his attention, she completely ignored the fact that the chief never said that he would not make such a recommendation. Rather, the chief simply he wanted to see supporting documentation and attempt to understand the alleged discrepancies.

**6. Qualified Immunity Is No Defense In This Case**

Defendants argue that even if the plaintiff's constitutional rights have been implicated, Sheppard (the individual defendant) is entitled to qualified immunity. In deciding this issue, the court's focus is whether or not the law was clearly established at the time of the constitutional violation and whether a reasonable official situated similarly to Sheppard would have understood that the conduct at issue contravened the clearly established law.

Defendants contend that because the plaintiff was a probationary employee who could be terminated with or without cause, then a reasonable officer similarly situated as Sheppard would not have understood that her conduct was violating plaintiff's clearly established rights. That argument might make sense if Sheppard utilized Article IX to terminate Dodd. However, she could not possibly have used that section of the charter since the language in Article IX is clear in requiring the recommendation of the chief. Notwithstanding Sheppard's testimony that might be described best

as an Abbott and Costello routine ('I used Article IX, no I used Article VI, no I used Article IX, no I used Article VI. I used both.'), she could have only used Article VI because she did not have the recommendation of the chief.

Sheppard, herself, was involved in two cases that went to the Rhode Island Supreme Court which made clear that in utilizing Article VI of the Town Charter. Sheppard had to establish "cause." Thus, she cannot be heard now to suggest that she did not understand that she was violating Dodd's constitutional rights. Moreover, Article XIV (§14-7) clearly provides that probationary employees (such as Dodd) do indeed have a property interest in their jobs and can only be terminated "for cause."

## III. MISCELLANEOUS MATTERS

### 1. The *Giglio* Issue

In her testimony, Sheppard indicated that she had conferred with the deputy chief when he raised the fact that Dodd would be 'damaged goods' for the rest of his career because of the *Giglio* decision. Deputy Chief Sullivan was aware of two matters that created *Giglio* issues in his mind. First was Dodd's response during the Lincoln psychological test relative to his earlier psychological examination. [redacted][4] Second was Dodd's failure to list his speeding violations on the Academy questionnaire—i.e. Exhibit 7. [redacted] There were no other *Giglio* issues from the deputy chief's perspective. [redacted] It is apparent that neither of these responses was "untruthful" much less a *Giglio* problem.

The use of the *Giglio* case has been misunderstood and overplayed in recent years. Most law enforcement officials do not realize that *Giglio v. U.S.*, 405 U.S. 150 (1972) did not involve a police officer. In *Giglio*, the criminal defendant learned after his trial that the main witness who testified against him had been given immunity in exchange for his testimony. The United States

---

[4] Sullivan actually was under the impression that Dodd had misrepresented whether he had even previously taken the test—not whether he had been found to be unsuitable. (Sullivan @ 69, Lines 2-6).

Supreme Court held that such information was Brady material (see *Brady v. Maryland*, 373 U.S. 83 (1963)) and thus, could have been utilized to impeach the witness. The so-called *Giglio* rule is implicated only in the context of an individual's truthfulness as it applies to his job. To suggest that anyone who has ever been untruthful at any time in their lives requires that disclosure to be made under the *Giglio* rule would mean that every law enforcement officer (or for that matter, anyone) would have a "*Giglio* problem."[5]

*Giglio* was intended to cover those situations where an officer has been found to be untruthful with respect to his duties. For example, if the officer has ever been departmentally charged and found guilty of lying to a supervisor or misstating facts on a police report.

All of that having been said, the defendants' concern about *Giglio* in this case has no bearing on the ultimate decision that has to be rendered by this court—i.e. should Dodd have been afforded a hearing and/or did Sheppard act arbitrarily in terminating him.

**2. Ricciarelli's Deposition**

David Ricciarelli's deposition was submitted to the court as Exhibit 21. Counsel advised the court at the conclusion of the trial that plaintiff's counsel would object to certain questions that were posed during the course of that deposition.[6]

Plaintiff's counsel objects to the following questions:

---

[5] Query: Would Sheppard have to disclose that she had "lied" on Dodd's Academy application (Exhibit 7) form wherein she certified that she had reviewed the information on the form and found it to be correct? The court will recall that at trial, Sheppard testified she signed the form even though she believed the information was inaccurate.

[6] The deposition was a discovery deposition and, therefore, even plaintiff's counsel asked certain questions that he might not ask at the time of trial. While Ricciarelli was available to testify in court, counsel agreed that to save time, his deposition could be used but their objections could be decided by the court as if they had been asked at the time of trial and objected to by either side.

- Page 17, Lines 8—Best evidence, non-responsive ("dismiss" vs. "denied entrance").

- Page 17, Line 16—Foundation and immaterial as the question calls for information once the candidate is in attendance at the Academy as opposed to when the candidate is filling out the application (see for example, Page 16, Lines 2-6).

- Page 18, Lines 3 and 19—Same objection as Page 17, Line 16.

- Page 19, Line 7—Ambiguous and speculative.

It is respectfully submitted that Ricciarelli's interpretation that speeding violations have to be listed on the Academy's form is simply incorrect. In the first place, when one receives a ticket for speeding, he/she is not "arrested." Most people, as was the case in Dodd's situation, pay their fine by mail. [redacted] Second, payment of the speeding ticket is a civil violation (see R.I.G.L. §31-27-13). Third, and perhaps most significant, is the predicate language to the question at issue. The very top of the page where the question is posed as to whether you have ever been "arrested" or "convicted" of a motor vehicle violation indicates that you must complete the **following** section if you have ever been arrested or convicted of a **crime**. It then defines "crime" as a "(felony or misdemeanor)."

This page of the application and questions posed has probably been around from the inception of the Academy. Rather than clarifying the question or advising those in charge of the Academy that speeding tickets are not criminal in nature, someone has simply thought it easier to take the position—'Speeding tickets are included'—when there is absolutely no legal basis for that.

## IV. THE RELIEF

### 1. Introduction

With the number of claims in the plaintiff's complaint—none of which are dependent on each other—there are numerous possible outcomes to this litigation and, therefore, a number of possible remedies.

### 2. The State Law Claims

As noted above, the two state law claims (Counts I and II) do not require this court to find that Dodd had a property interest in his job. Therefore, even if the court finds that Dodd's constitutional rights were not implicated in this matter, judgment should still enter for Dodd on his state law claims.

If the court finds that the town administrator had no authority to act under Article IX because the chief must make a recommendation to terminate a probationary employee under that section before the town administrator can act, then the court should direct judgment to be entered in favor of the plaintiff. The relief under such a scenario would provide the plaintiff with his damages—i.e. all back pay and benefits and also include a directive that Dodd be reinstated until such time that the chief recommends to the town administrator that he be terminated.

Similarly, if the court finds that the town administrator had no authority to act under Article VI because Dodd was not given an opportunity to be heard (thus no cause was shown—see *Kells* and *Stewart*), then the court should direct judgment to be entered in favor of the plaintiff. The relief under this scenario would provide the plaintiff with his damages—i.e. all back pay and benefits and include a directive that Dodd be reinstated with pay and benefits until such time that the town administrator and the town comply with the mandates of Article VI.

### 3. The Constitutional Claims

Plaintiff urges this court to conclude that he had a property interest in his job as a police officer—even though he was a probationary employee. Article VI and the two Rhode Island Supreme Court cases directly on point (*Kells* and *Stewart*), as well as the provisions set forth in

Article XIV, clearly create an expectation that unless the chief of police makes a recommendation to have a probationary officer terminated, then the only way such an employee can be terminated is if he/she is afforded due process.

Once a property interest has been shown, it is abundantly clear that Dodd was not afforded any procedural due process. He was not forewarned, he was not afforded an opportunity to be heard at a meaningful time and in a meaningful manner (see *Amsden v. Moran*, 904 F.2d 748 (1st Cir. 1990). If the court were to find in favor of the plaintiff with respect to his procedural due process claim, then the relief thereunder should be the payment of damages—i.e. all back pay and benefits, as well as a directive that Dodd be reinstated until he is afforded his due process rights. In addition thereto, Dodd would be entitled to his attorney's fees pursuant to the provisions of 42 U.S.C. §1988.

Finally, this court may conclude with respect to Dodd's constitutional claims that his substantive due process rights were violated and that based on the evidence presented to the town administrator, her decision to terminate Dodd was without cause. In effect, the court would be concluding that Sheppard's actions were arbitrary and capricious and that Dodd should retain his position as a police officer with the Lincoln Police Department. The relief for finding that Dodd's substantive due process rights were violated would be his damages—i.e. all back pay and benefits, a directive that he be reinstated as a member of the Lincoln Police Department, and the award of attorney's fees.[7]

## V. CONCLUSION

This is one of those cases where justice cries out for the court to intervene to protect Dodd against actions taken by an individual who failed to do due diligence before giving Dodd his "death sentence" in the labor market. Even though Dodd has dropped his demand for a name-clearing

[7] Counsel realizes that if he is successful on either of the two constitutional claims, he will have to file a separate petition requesting attorney's fees pursuant to 42 U.S.C. §1988.

hearing because there was no public dissemination of the town's actions when he was terminated, it is equally clear that his lifelong ambition of becoming a police officer will be over if this court does not afford him the relief he seeks. The town administrator's statement that she agonized over this decision for a week is disingenuous. Had she truly been concerned about Dodd, at a minimum, she would have requested supporting documentation referenced in Dr. Gallagher's letter of August 10, 2005. Had she done so, certain questions would have been raised concerning the obvious bias that Dr. Gallagher has shown against Dodd. In fact, the entire institution of this "investigation" is somewhat suspect.

- Moreau saw Dodd at the Academy as early as April, 2005 (when he was teaching) or no later than June 24, 2005 (the date of graduation). Yet, it was not until he had a conversation with Chief Kelley in the second week of August, 2005—when he was advised of the Chief's confrontation with Dodd's grandfather at the State House—that he placed his call to Dr. Gallagher. [redacted]

- Moreau was aware that a candidate can retake the psychological evaluation after waiting a year. [redacted] In fact, Dr. Gallagher had told him **prior to this matter** that candidates could pass the test even though they had received an unsuitable rating in the past. [redacted] Why then did Moreau make an inquiry about how this could have occurred in Dodd's situation when he already knew the answer?

- Gallagher made clear that her normal procedure in a situation of this type would be to call the chief of the department. [redacted] Gallagher claims that she did not do this here because she had no relationship with Chief Kells. [redacted] She claimed that every time she called Chief Kells, she ended up speaking with Deputy Chief Sullivan. [redacted] However, for some inexplicable reason, instead of at least attempting to reach the chief [redacted], she called the town administrator with whom she had never spoken. [redacted]

- Both Moreau and Deputy Chief Sullivan testified that Moreau wanted a waiver from the town before disclosing the confidential psychological evaluation done on behalf of Pawtucket. He

obviously was aware that he needed such a waiver. Yet, he gave up confidential information upon receipt of two documents (Exhibits 4 and 13) which clearly do not allow such a disclosure.

- Moreau's testimony that he advised Dodd of his failure of the psychological examination is suspect. Moreau claims that he had this conversation with Dodd in February of 2003. During his examination by the Court, he added that during that same conversation, he advised Dodd that he wasn't eligible to retake the examination "**for one year.**" [redacted] In fact, at that point, the Court pressed Moreau as to whether or not he actually used the time period and he restated that he told Dodd that he wasn't eligible "**for one year.**" [redacted] Finally, on re-cross-examination, Moreau stated that he recalled that portion of the conversation specifically. [redacted] We know that there is no way that Moreau could have had such a conversation with Dodd in February of 2003 because at that time, the law was that an individual had to wait **two years** before being allowed to retake the examination. Unless Moreau was clairvoyant, he would have no way of knowing that the law was going to change 11 months later in January of 2004.

In conclusion, this court should grant Dodd the relief requested in his complaint and expounded in this memorandum.

Respectfully submitted,
PLAINTIFF, Samuel E. Dodd
By his Attorney,

4/20/06

Joseph F. Penza, Jr., Esq. #0607
OLENN & PENZA, LLP
530 Greenwich Avenue
Warwick, RI 02886
PHONE: (401) 737-3700
FAX: (401) 737-5499

**CERTIFICATION**

I certify that I sent a true copy of the within on 4/4/06 to:

Marc DeSisto, Esq.
DeSISTO LAW OFFICES
211 Angell Street
Providence, RI 02906