UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| Samuel E. Dodd, | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| Sue P. Sheppard, individually and in her capacity as Town Administrator for the Town of Lincoln; and the Town of Lincoln, by and through its Treasurer, Stephen Woerner, | ) | C.A. No. 05-519S |
| Defendants. | ) | |

## DECISION AND ORDER

WILLIAM E. SMITH, United States District Judge.

### I.   Introduction

This case involves a young man's attempts to become a police officer with various police departments in the state of Rhode Island and the circumstances that ultimately led him to resign from the Lincoln Police Department. Upon resigning, Plaintiff Samuel E. Dodd ("Plaintiff") brought this action pursuant to 42 U.S.C. § 1983 against Lincoln Town Administrator Sue Sheppard ("Sheppard") and the Town of Lincoln (at times collectively referred to as "Defendants") contending that Defendants' actions in connection with his August 24, 2005 severance from employment with the Lincoln Police Department violated his due process rights under the Fourteenth Amendment of the United States Constitution. Additionally, Plaintiff has asserted state law claims arguing that

under the Lincoln Town Charter, Sheppard exceeded her authority and failed to follow the proper procedure in terminating Plaintiff's employment.

This Court held a bench trial on this matter from March 14, 2006 through March 16, 2006.  The parties filed post-trial briefs including proposed findings of fact and conclusions of law on April 7, 2006.  After considering all of the evidence, including live witness testimony, exhibits, as well as the parties' written pre-trial and post-trial submissions, this Court finds that judgment shall enter for Defendants and against Plaintiff on all counts.

II.  <u>Findings of Fact</u>

A.  <u>Pawtucket Police Department</u>

The roots of this lawsuit reach back to 2001, when Plaintiff embarked on his effort to forge a career in law enforcement by applying  to be a police officer with the Pawtucket, Rhode Island Police Department.   During the Pawtucket application process, Plaintiff had every reason to think things were going smoothly, especially when, in late 2002 or early 2003, he was advised that he was being considered for the upcoming Rhode Island Municipal Police Training Academy (the "Academy"), one of the final prerequisites to becoming a police officer.

In  February  of  2003,  however,  Plaintiff's  Pawtucket application process took a turn for the worse.  Plaintiff, as a requirement  for  employment  with  Pawtucket,  took  and  failed  a

psychological evaluation administered by the University of Rhode Island Testing Services (the "Testing Services"). Upon completion of the written portion of that test, on February 19, 2003, Plaintiff interviewed with Dr. Andrew J. Wrobel ("Wrobel"), a clinical psychologist. During that interview, Wrobel identified several areas of concern, including an impression that it was difficult to elicit information from Plaintiff. These concerns necessitated a second interview with another psychologist, Dr. Patricia Gallagher ("Gallagher"), a clinical psychologist who is also the Director of the Testing Services. Gallagher explained to Plaintiff that the second interview with her was necessary in order to cover areas of concern that had been identified during the first interview. At the conclusion of both interviews, Plaintiff received an "Unsatisfactory - 1 - Below Average" rating. This rating, which rendered Plaintiff ineligible for employment with Pawtucket, was based on two factors: first, the psychologists believed that Plaintiff's numerous traffic violations, inability to meet financial obligations, and inability to thrive academically in college evidenced difficulty with "his ability to control his impulses and act in a responsible fashion"; and second, the psychologists found that Plaintiff had a "tendency to be less than forthcoming . . . [which] raises the question as to whether or not he provided complete information in the interview and possibly on

testing." In summary, the report relied on several considerations to conclude that Plaintiff was less than forthcoming, including:

- Plaintiff's overall tendency to respond to questions "in a brief and somewhat circumscribed fashion;"

- on the background form, Plaintiff failed to disclose that he had attended the University of Rhode Island (although it was elicited during direct questioning that Plaintiff had a cumulative grade point average of 1.55 during three semesters there);

- on the background form, Plaintiff indicated that he had received an Associates degree (although it was elicited during direct questioning that he in fact had not yet received his degree);

- on the background form, Plaintiff indicated that he had some financial problems he was dealing with (although it was elicited during direct questioning that specifically, Plaintiff had defaulted on three credit cards, had difficulty meeting student loan obligations, and had difficulty paying his cellular telephone bills);

- on the background form, Plaintiff indicated that he had received a summons for driving with a suspended license (although it was elicited during direct questioning that Plaintiff also had a number of traffic violations); and

- on the background form, Plaintiff indicated that he had not had contact with any members of the mental health field (although it was elicited during direct questioning that he had in fact seen a mental health professional for a single session during the transition between living with his father and returning to Rhode Island).

The results of the psychological evaluation performed for Pawtucket were not disclosed to Plaintiff by the Testing Services. Sometime shortly after February 21, 2003, however, Plaintiff received a letter from the City of Pawtucket stating that "based on the state requirements for the police academy, you are no longer being considered for the up-coming Rhode Island Municipal Police

4

Academy." Understandably disappointed and wanting answers, Plaintiff called Pawtucket Police Captain Bruce Moreau ("Moreau") and asked Moreau why he was no longer being considered for employment by Pawtucket.[1] Moreau explained to Plaintiff that he was ineligible for the Pawtucket Police Department based upon the results of his psychological evaluation, and moreover, that the results made Plaintiff ineligible for employment with any other police department for one year.[2]

B.   Lincoln Police Department

In 2003, Plaintiff's grandfather, a man who had been a prominent role model for Plaintiff throughout his life, became seriously ill.   Apparently motivated by their close relationship and his grandfather's deteriorating health, in late 2003, Plaintiff adopted his grandfather's name by changing his name from "Samuel E. Apkarian II" to "Samuel E. Dodd."

---

[1] Moreau was in charge of Pawtucket's Planning and Training Division and was involved in the recruitment and processing of potential candidates for the Academy.

[2] This finding is based upon a credibility determination the Court has made which credits Moreau's testimony over Plaintiff's. At trial, Plaintiff testified that Moreau never directly told him he had failed the psychological evaluation.   Plaintiff also testified that he believed Pawtucket rejected him, not because of anything related to the psychological evaluation, but because the Pawtucket Chief of Police questioned Plaintiff's desire to become a police officer and did not believe Plaintiff knew the government officials who had submitted reference letters on Plaintiff's behalf.

Plaintiff's experience in Pawtucket did not dampen his resolve to become a police officer.  On October 19, 2004, under his new name of Samuel E. Dodd, Plaintiff filed an application to become a police officer with the Town of Lincoln.  As part of the Lincoln application process, Plaintiff interviewed with Sheppard, Lincoln Deputy Chief Brian W. Sullivan ("Sullivan"), and a lieutenant from the Lincoln police department.  During the interview, Sheppard asked Plaintiff about his name change and was impressed by the story about Plaintiff's grandfather.  Prompted by a question from Sullivan concerning whether Plaintiff had anything in his past that, if revealed, could embarrass the town, Plaintiff responded in general terms about some speeding tickets and credit problems he had when he was younger. After the interview, Plaintiff again had every reason to think the application process was progressing favorably, especially when he was advised that he had been selected for employment as a Lincoln police officer and would be attending the Academy commencing on March 14, 2005.

Before he could attend the Academy, however, Plaintiff had to pass a psychological evaluation that was to be conducted on January 25, 2005 by the same Testing Services that had given Plaintiff an unsatisfactory rating in 2003.  At the time of this second psychological evaluation, Plaintiff did not disclose to the testing service that he had changed his name or that he had previously received an unsatisfactory rating from the Testing Services.

6

Plaintiff did, however, fill out and sign several forms - the following are Plaintiff's answers to questions on these forms that are relevant to this litigation:

- Plaintiff left blank that portion of the personal history form asking for an "Alias/Other Name";

- In response to that portion of the personal history form asking "Have you ever failed a public safety psychological evaluation?", Plaintiff responded "Not to my knowlege [sic]";

- In response to that portion of the personal history form asking "Explain any problems with your finances that affected your credit rating," Plaintiff responded "I was young and in college";

- In response to that portion of the personal history form asking "List all legal difficulties relating to both <u>adult</u> and <u>juvenile arrests, dropped charges</u> and <u>expunged records</u> including being stopped by police, traffic violations, arrests, domestic violence citations, etc." (emphasis in original), Plaintiff responded "None";

- In response to those portions of the PAI and CPI Reports asking "Have you taken pre-employment psychological tests before?", Plaintiff indicated that he had "once";

- In response to that portion of the personal history form asking whether he had any "<u>Past</u> medical interventions, counseling/psychotherapy and/or any meds," Plaintiff responded "No."

On February 9, 2005, after completing the written psychological tests, Plaintiff met with Dr. Gerald D. Fontaine ("Fontaine"), a licensed psychologist, who passed Plaintiff by giving him a "Satisfactory - 3 - Average" rating. Of importance in Fontaine's psychological report are the following written comments evidencing what occurred during the psychological interview: "The candidate reports that he has never had any legal difficulties"; "[c]redit

problems and bankruptcies were also denied"; and "[h]e denies having any academic difficulties during his years in school.".

Having successfully navigated the rigors of the psychological evaluation, Plaintiff enrolled in the Academy, graduated with flying colors (receiving a leadership award in the process), and was sworn in as a member of the Lincoln Police Department on July 1, 2005. As such, Plaintiff became a probationary police officer and was required to complete a probationary period of six months before being appointed a regular officer. It seemed that Plaintiff's professional dreams were finally being fulfilled. This good fortune, however, would be short-lived.

1.   <u>Moreau speaks with Gallagher</u>

During the time Plaintiff was serving as a probationary police officer, unbeknownst to him, it was slowly becoming apparent to certain officials that Samuel E. Dodd was the same Samuel E. Apkarian II who had failed the psychological evaluation in 2003 and had been rejected by the Pawtucket Police Department. This revelation began to surface when Moreau, who had not spoken to Plaintiff since their February 2003 telephone conversation (in connection with Plaintiff's Pawtucket application), noticed Plaintiff at the 2005 Academy graduation. Because Moreau was unsure exactly how it was that he recognized Plaintiff, Moreau decided to check Plaintiff's record at the administrative office of the Academy, which revealed that Plaintiff was in fact the same

8

Samuel E. Apkarian II who Moreau had dealt with in 2003.  In early August of 2005, Moreau, who frequently spoke with Gallagher about new recruits, asked Gallagher how a candidate such as Samuel E. Apkarian II could receive an unsatisfactory rating on one psychological evaluation and then receive a satisfactory rating on a subsequent evaluation. Slightly confused, Gallagher explained in general terms how a candidate could receive different ratings on separate evaluations, but told Moreau that according to her records, Samuel E. Apkarian II had only taken one psychological test - the one in 2003.  Moreau then enlightened Gallagher by explaining how Samuel E. Apkarian II had changed his name to Samuel E. Dodd, and that he had only recently passed a psychological evaluation for employment with Lincoln.

### 2. Gallagher speaks with Sheppard

As one of the psychologists that had evaluated Plaintiff in 2003, and as the head of the Testing Services, Gallagher found Moreau's information especially troubling.  She therefore immediately reviewed the paperwork Plaintiff had submitted to the Testing Services in connection with his second psychological evaluation.  Believing that inaccurate information in these forms caused Plaintiff's satisfactory rating on his psychological evaluation for the Town of Lincoln to be invalid, Plaintiff called Sheppard to notify her of what she had learned through Moreau, and advised Sheppard that it was necessary to take appropriate

administrative action.   The substance of this conversation was
detailed in a three page letter Gallagher sent to Sheppard dated
August 10, 2005.   Therein, Gallagher described the revelation that
Dodd and Apkarian were the same person as "shocking" and explained
that during the 2005 evaluation, "several omissions of information
as well as mistruths were elicited" from Plaintiff and as a result,
"it identifies a major concern, Mr. Dodd's integrity, given the
enormous amount of omitted and fabricated information provided by
this recruit."   In the letter, Gallagher focused Sheppard's
attention on several of Plaintiff's responses to questions posed
during the Lincoln application process which she believed called
into question Plaintiff's integrity.   Specifically, Gallagher
pointed out that Plaintiff failed to list Samuel E. Apkarian II as
an "alias/other name" on the personal history form.   Had this
information been provided, according to Gallagher, Plaintiff's
"complete previous law enforcement psychological folder would have
been accessed," which contains the first psychological test results
and the rationale for the unsatisfactory rating (impulse control
and tendency to be less than forthcoming).   Gallagher also found
the response "[n]ot to my knowledge" to the question asking whether
Plaintiff had ever failed a public safety psychological evaluation
"questionable," considering Plaintiff had not been accepted to the
2003 Police Academy after he took his first psychological
evaluation.   Gallagher next noted that Plaintiff failed to disclose

any legal problems on either the personal history form or during the clinical interview with Fontaine.   Gallagher explained to Sheppard that this simply was not true and in support, referenced in detail a Pawtucket Police Department background investigation revealing numerous speeding and traffic violations, a suspended license for failure to appear, and an arrest for Operating After Suspension by the South Kingstown Police Department on June 30, 2001.  Finally, Gallagher noted as suspect Plaintiff's answer that he was "young and in college" to the question on the personal history form asking to "explain any problems with your finances that affected your credit rating," as well as Plaintiff's denial during the clinical interview that he had any credit problems or bankruptcies.  In support, Gallagher again referenced the Pawtucket Police Department background investigation which stated:  "A check with Rhode Island Superior, District and Family Courts revealed no actions pending, however, during his interview the candidate stated that the University of Rhode Island had sanctions against him for owing money.  A check revealed this amount to be $2,000.00. Apkarian also found to have defaulted on two (2) credit cards."  In conclusion, Gallagher wrote to Sheppard:

> Background information is an important consideration when conducting a psychological evaluation.  Critical information obtained from Mr. Dodd during his law enforcement psychological assessment for the Lincoln Police Department was misrepresented.  This distortion underscores the major concern, Mr. Dodd's integrity.  I am reporting this matter to you given the gravity of the concern so that you may take appropriate action.

Although it was not detailed in her letter, Gallagher also testified that she found problematic Plaintiff's "No" response to that portion of the personal history form asking whether he had any "Past medical interventions, counseling/psychotherapy and/or any meds." Gallagher found this troubling because when she had interviewed Plaintiff in 2003, although he had originally answered "No" to a similar question on a background form, Gallagher eventually elicited from Plaintiff that he had in fact seen a mental health professional on one occasion. Gallagher believed this should have been disclosed on the 2005 personal history form, especially considering that in 2003, she had emphasized to Plaintiff the importance of disclosing this information in the first instance.[3]

### 3. Sheppard contacts Moreau

On August 11, 2005, after receiving Gallagher's letter, Sheppard met with Sullivan and asked him to contact Moreau to retrieve documents concerning Plaintiff's Pawtucket application.[4]

---

[3] At trial, Plaintiff explained that the referenced session was arranged by his parents when he was a teenager to assist him in adjusting to his move from New Hampshire to Rhode Island. The visit was not noteworthy in its own right except to the extent that Plaintiff had been previously told by Gallagher that it should have been revealed.

[4] Sheppard decided to contact Sullivan instead of Lincoln Chief of Police Robert Kells because Sheppard believed that "political overtones" stemming from Kells' relationship with Plaintiff's grandfather would prevent Kells from exercising independent judgment.

Sullivan contacted Moreau who, through Pawtucket Sergeant Karalis, sent a packet of documents to Sullivan which included Pawtucket's background investigation of Plaintiff conducted by Pawtucket Sergeant Michael Cute (this background investigation was not introduced as an exhibit), and Gallagher's 2003 typewritten psychological report which gave Plaintiff an "Unsatisfactory - 1 - Below Average" rating.   Sullivan reviewed these documents and, around August 15 or 16, gave them to Sheppard.  By this time, in addition to the documents received from Pawtucket and the Lincoln application materials, Sheppard also had in her possession: (1) the 2005 typewritten psychological report which gave Plaintiff a "Satisfactory - 3 - Average" rating; (2) a "Banner Report," which indicates "Arrest Information" for an incident that occurred in South Kingstown, Rhode Island in which Plaintiff was charged with driving with a suspended license and lists the "Arresting Agency" as the South Kingstown Police Department; (3) an "Accurint Report," which lists Plaintiff's various speeding violations; and (4) a Bureau of Criminal Identification report, received from the Attorney General's Office, which indicates "NO RECORDS FOUND."

Between August 16 and 19, 2005, Sheppard discussed Plaintiff's situation with several people, including Sullivan, who explained to Sheppard that based upon his review of Plaintiff's file, he had some concerns about Plaintiff's ability to be a credible witness and that in essence Plaintiff would be "damaged goods" for the rest

of his career (what Sullivan also described to Sheppard as a
"Giglio issue" based upon <u>Giglio v. United States</u>, 405 U.S. 150
(1972)).[5]  Additionally, Sheppard discussed Plaintiff's situation
with then Cumberland Police Chief Anthony Silva, who was the chair
of the Commission on Standards and Training at the Academy, and
expressed her concerns about Plaintiff's integrity and why she
thought Plaintiff should not be working as a police officer.  Chief
Silva advised her she was "dead on."  Finally, Sheppard had a
conversation about Plaintiff's situation with Lincoln's labor
attorney Vincent Ragosta, the substance of which was not disclosed
at trial, but which, in all probability, consisted of advice
regarding how to handle the situation.

By August 19, 2005, based upon the information conveyed by
Gallagher, the documents retrieved from Pawtucket, Sheppard's
belief that Plaintiff had provided inaccurate information on both
the Lincoln Application for Employment form[6] and the Municipal

---

[5] In the seminal case <u>Brady v. Maryland</u>, the United States
Supreme Court held that the government's failure to disclose
evidence favorable to a defendant who had requested it violated the
accused's due process when the evidence was material to either
guilt or punishment, irrespective of whether the prosecution acted
in good faith.  <u>See</u> <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963).  In
<u>Giglio</u>, the Supreme Court held that the <u>Brady</u> rule includes
information that could be used to impeach the credibility of a
prosecution witness when the reliability of the witness could help
determine the guilt or innocence of the accused.  <u>See</u> <u>Giglio</u>, 405
U.S. at 154.

[6] Plaintiff responded "No" to that part of the Lincoln
Application for Employment form asking "Have you been convicted of
a felony or misdemeanor within the last 5 years?"

Application for Enrollment form,[7] and discussions Sheppard had with various officials, Sheppard decided that Plaintiff should be severed from employment with the Town of Lincoln, while still in his probationary period.

### 4.   Sheppard and others meet with Plaintiff

On August 24, 2005, Plaintiff was called to a meeting with Sheppard and other Lincoln Town officials at 4:00 p.m. Approximately fifteen minutes before the meeting was scheduled to begin, Sheppard met with Lincoln Chief of Police Robert Kells ("Kells") and, for the first time, advised him of the circumstances.   There was conflicting testimony concerning what happened between Sheppard and Kells next, but both agree that Kells was not pleased about learning of Plaintiff's situation only fifteen minutes before the scheduled meeting.   According to Sheppard, she presented Kells with all the documents in her possession at that time and told Kells they had "an integrity issue" with one of their new police officers.   She then asked Kells, "Will you handle the dismissal or will I handle it?" to which Kells responded "I'll handle it."   By this, Sheppard understood that Kells would begin the meeting with Plaintiff, explain the integrity problems, and tell Plaintiff that he had the

---

[7] Plaintiff responded "No" to that part of the Municipal Application for Enrollment form asking "Have you ever been arrested and/or convicted for any criminal offense or motor vehicle violation?"

option of being fired or resigning. Kells, however, presented a slightly different story. According to Kells' testimony, Sheppard only showed him the typewritten psychological reports from 2003 and 2005. After reviewing them, Kells did not believe he had enough information to make a decision concerning Plaintiff's employment and testified that he was not going to fire Plaintiff at the 4:00 p.m. meeting.

Under either version of events, the 4:00 p.m. meeting proceeded as scheduled with the following people in attendance: Plaintiff, Sheppard, Kells, Sullivan, personnel director Chuck Mainville, and a member of the personnel board named John Shey. Kells began the meeting by advising Plaintiff about the information that had been uncovered. Then, at some point after Kells had finished speaking, he asked Plaintiff to leave the room so that he could speak with Sheppard and the others. While Plaintiff waited outside, Kells loudly expressed that he was angry to have been brought into the loop so late in the process, and that he would not support the decision to sever Plaintiff's employment. Kells also stated that he believed that even if Plaintiff had lied, Kells could still "take him under his wing" and make sure that Plaintiff did not lie in the future. During this time, Kells also tried to garner Sullivan's support, which Sullivan declined to give because he believed that Plaintiff was ultimately unfit to be a police officer. Plaintiff was then called back into the room and the

discussion once again centered on Plaintiff's responses during the application process.   During the entire meeting Plaintiff was shocked, but at no point did Plaintiff question the accusations that were being leveled against him or confront Sheppard or the other town officials.   Thereafter, Sheppard advised Plaintiff that he had the option of either resigning or having his employment terminated.   The meeting ended sometime between 4:30 and 4:45 p.m.

5.   <u>Plaintiff submits his resignation letter</u>[8]

After the meeting, Kells collected Plaintiff's badge and Sullivan escorted him to the police station to retrieve items from Plaintiff's locker.  While walking to the police station, Plaintiff did not initiate a conversation with Sullivan or indicate that he believed he was being treated unfairly.   Because some of Plaintiff's police-issued gear was at his house, Plaintiff was allowed to go home to collect the gear and change into some personal clothes, which took approximately forty-five minutes.[9]

---

[8] The following sequence of events is primarily based upon a credibility determination the Court has made which credits Sullivan's testimony over Plaintiff's because the Court finds Sullivan's testimony is ultimately clearer and more reasonable.  At trial, Plaintiff testified that after the meeting with town officials, he went to Sullivan's office, typed his resignation letter in less than five minutes, went home to collect his gear (with Sullivan's reluctant permission), and returned to the police station where he met with McRoberts for "probably about five to ten minutes" although Plaintiff testified "it could have been thirty minutes."

[9] Plaintiff was told he could return the gear the next day, but he instead opted to return to the police station that night.

17

While Plaintiff was at home, Sullivan, concerned for Plaintiff's mental health, called Officer McRoberts ("McRoberts"), a peer support counselor, and asked him to meet with Plaintiff. When Plaintiff returned to the police station, he and McRoberts had a conversation in Sullivan's office for approximately thirty to forty minutes. Once they were finished, Sullivan told Plaintiff that Sheppard wanted a typed letter of resignation, which Plaintiff completed that evening on Sullivan's computer.

The next day, August 25, 2005, Plaintiff sought to withdraw his resignation. Upon the advice of labor attorney Vincent Ragosta, Sheppard refused Plaintiff's request.

III. <u>Conclusions of Law</u>

In order to prevail under § 1983, Plaintiff must prove that he was deprived of a right secured by the Constitution or a federal statute by a person acting under color of state law. See <u>Parratt v. Taylor</u>, 451 U.S. 527, 535 (1981). Plaintiff alleges both procedural and substantive due process violations. See <u>Pittsley v. Warish</u>, 927 F.2d 3, 6 (1st Cir. 1991). The procedural due process component focuses on the adequacy of procedures provided by the state (or municipality) in effecting the deprivation of liberty or property, while substantive due process zeroes in on the limits of what a state actor may do to an individual irrespective of any procedural protections provided. <u>Id.</u> The Court will address each due process claim in turn and, because they are inextricably

18

linked, Plaintiff's state law claims will be addressed in the context of the procedural due process discussion.

A.   Procedural Due Process (Count IV)[10]

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 569 (1972). Thus, when considering the instant procedural due process claim, the Court must determine whether Plaintiff had a protected property interest in continued employment entitling him to due process protection, and if so, what process was due.

1.   Voluntary Resignation

Plaintiff admits he ceased to be an employee of the Town of Lincoln when the Town accepted his signed resignation letter. The fact that the Town did not officially discharge Plaintiff from his employment creates a significant obstacle because when an employee resigns from his position, "even though prompted to do so by events set in motion by his employer," he has no procedural due process claim. Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 167, 173 (4th Cir. 1988); see also Parker v. Bd. of Regents of Tulsa Jr.

---

[10] Plaintiff has advised the Court that he no longer intends to pursue Count III of his complaint, which alleges Plaintiff was deprived of a liberty interest when he was not granted a name-clearing hearing. Accordingly, judgment shall enter for Defendants on Count III and the Court need not discuss further this aspect of Plaintiff's procedural due process claim.

Coll., 981 F.2d 1159, 1162 (10th Cir. 1992) ("If she resigned of her own free will, even though doing so due to actions of defendants, she voluntarily relinquished her property interest and was not deprived of [procedural due process]."). If, however, Plaintiff's resignation was effectively involuntary, so much so that it amounted to a constructive discharge, then "it must be considered a deprivation by state action triggering the protections of the due process clause." Stone, 855 F.2d at 173.

The parties, not surprisingly, take antipodean positions about how to treat Plaintiff's resignation. Plaintiff paints the circumstances surrounding his resignation in broad strokes of coercion and duress, arguing that he was unable to exercise free will when he resigned; or in other words, that his resignation was so involuntary as to amount to a constructive discharge. See Stone, 855 F.2d at 173 n.7. Defendants dispute the accuracy of this picture and claim that Plaintiff's resignation is replete with evidence of voluntariness.

The Court begins its analysis of this issue with a presumption that Plaintiff's resignation was voluntary. See, e.g., Hargray v. City of Hallandale, 57 F.3d 1560, 1568 (11th Cir. 1995). It is incumbent on Plaintiff, therefore, to present "evidence to establish that the resignation or retirement was involuntarily procured." Leheny v. City of Pittsburgh, 183 F.3d 220, 227 (3d Cir. 1999). In determining whether Plaintiff has met his burden,

"the court must examine the surrounding circumstances to test the ability of the employee to exercise free choice." Hargray, 57 F.3d at 1568. Relevant factors to consider include whether the employee: (1) was given an alternative to resignation; (2) understood the nature of the choice he was given; (3) was given a reasonable time in which to make his decision; and (4) was permitted to select the effective date of resignation. See Stone, 855 F.2d at 174. Although not entirely dispositive, these factors clearly lay out the analytical path the Court must tread in answering the voluntariness question. See Hargray, 57 F.3d at 1568.

Upon weighing these factors and having had the opportunity to assess the credibility of the witnesses at trial, the Court finds Plaintiff is unable to meet his burden of showing that his resignation was involuntary. To begin, based upon the consistent testimony that Plaintiff was given a choice during the meeting and Plaintiff's acknowledgment of this choice in his letter attempting to revoke his resignation,[11] the Court concludes that Plaintiff was clearly given the choice of resigning or being fired. While it is true that this choice was a difficult one, "the mere fact that the choice is between comparably unpleasant alternatives" is

---

[11] In his letter, dated August 25, 2005, Plaintiff wrote: "I was given two choices by those in attendance [at the August 24, 2005 meeting]. First I would be terminated from employment or second I could submit my resignation."

insufficient to convert a resignation into an involuntary one, "unless the employer actually lacked good cause to believe that grounds for termination existed." Stone, 855 F.2d at 174; see also Christie v. United States, 518 F.2d 584, 587 (Ct. Cl. 1975) ("The fact remains, plaintiff had a choice. She could stand pat and fight.") (emphasis in original). A careful review of the information Sheppard had in her possession as of the August 24, 2005 meeting shows that Sheppard had good cause to reasonably believe grounds for termination existed. Gallagher, the Head of the Testing Services, had discussed with Sheppard in detail how Plaintiff's answers to questions on forms were either completely untruthful or less than forthcoming, that Plaintiff had previously received an unsatisfactory rating on the 2003 psychological evaluation because of impulse control problems and a reluctance to fully answer questions, and that his psychological evaluation for the Town of Lincoln was invalid. The Head of the Testing Services had also advised Sheppard that it was necessary to take appropriate administrative action. It is somewhat telling that at this point, instead of immediately beginning the termination procedure, Sheppard retrieved documents related to Plaintiff's Pawtucket application in order to verify the information relayed to her by Gallagher - primarily, Sheppard obtained Pawtucket's background investigation of Plaintiff and Gallagher's 2003 typewritten psychological report as well as the Banner Report. It is also

22

telling that Sheppard discussed Plaintiff's situation with Sullivan, the chair of the Commission on Standards and Training at the Academy, and a respected labor attorney, all of whom agreed that Plaintiff should no longer be a member of the Lincoln police force.[12] In sum, Sheppard was armed with enough information to have good cause to reasonably believe grounds for termination existed.

Plaintiff attempts to chip away at the reasonableness of Sheppard's belief by offering various justifications and explanations for the answers given during the Lincoln application process. For example, Plaintiff states that his speeding tickets were merely civil violations and that he was never "arrested" by the South Kingstown Police Department in 2001, but merely given a citation; thus, all of his answers denying any arrests or convictions should not have been considered untruthful by Lincoln officials. But, to take this particular example a step further, the fact is that in August of 2005, Sheppard possessed the Pawtucket background investigation report indicating Plaintiff had been arrested, as well as the Banner Report which seemingly verified the information obtained from Pawtucket. So even though it may be true that Plaintiff was never technically "arrested,"

---

[12] Although the substance of Sheppard's conversation with attorney Vincent Ragosta was not revealed at trial, Sheppard testified about this conversation in the context of explaining that various officials agreed with her approach. The Court concludes, therefore, that at a minimum, Mr. Ragosta did not offer contrary advice.

23

there is no indication that Sheppard knew or believed at the time that the concerns that had been brought to her attention, through legitimate channels, could not be substantiated. See Stone, 855 F.2d at 177.

Irrespective of Plaintiff's attempted justifications for some of his answers, however, Plaintiff provided false information on at least three occasions: (1) when he answered "None" to that portion of the personal history form asking "[l]ist all legal difficulties relating to both <u>adult</u> and <u>juvenile arrests, dropped charges</u> and <u>expunged records</u>, including being stopped by police, traffic violations, arrests, domestic violence citations, etc." (emphasis in original); (2) when he answered "Not to my knowlege [sic]" to that portion of the personal history form asking "Have you ever failed a public safety psychological evaluation?"; and (3) when he stated that he had never had any past medical interventions, counseling or psychotherapy. These false answers, when considered alongside the less-than-flattering 2003 psychological report, Gallagher's letter, and the conversations Sheppard had with Gallagher, Sullivan, and other officials, convince the Court that Sheppard had good cause to reasonably believe grounds for termination existed.

Moving on to the remaining factors detailed in Stone, the Court finds that Plaintiff's August 25, 2005 letter unequivocally shows that he understood the nature of the choice he had been

24

given.  Moreover, Plaintiff had a reasonable time in which to make his decision.  After the 4:00 p.m. meeting, Plaintiff was able to go home, change clothes, and meet with a peer support counselor, all before submitting his resignation letter.  This is not to say, of course, that there was no element of time pressure.  But, any possible coercive atmosphere that existed when Plaintiff signed his resignation letter, considering that he had been free to leave the police station and given the opportunity to consult with a counselor before signing anything, is relatively minuscule when stacked up against the cases in which a resignation has been found to be involuntary based upon coercion or duress.  See, e.g., Angarita v. St. Louis County, 981 F.2d 1537, 1545 (8th Cir. 1992) (resignation found involuntary where employees told they could not leave a room without signing a resignation form, their requests to speak to supervisors were denied, and employees threatened with public disclosure of allegations); Paroczay v. Hodges, 297 F.2d 439 (D.C. Cir. 1961) (employee's resignation found involuntary where employee told he could not leave room without signing a resignation form and employee was not allowed to have more time or consult with an attorney despite requests to do so).  It is also noteworthy that there is no credible evidence in the record showing Plaintiff requested more time to make a decision or to speak with a supervisor or attorney.  Finally, the last Stone factor appears to weigh in Plaintiff's favor - there is no indication that Plaintiff

was permitted to select the effective date of resignation. This factor alone, however, is not enough to tilt the scale in the direction of a finding of coercion or duress.

Any doubt the Court may have had about the voluntariness of Plaintiff's resignation evaporated in light of several facts that were revealed during trial. First, at no point during the meeting on August 24 did Plaintiff attempt to defend himself significantly or explain away any of the accusations that were being leveled against him. Nor did Plaintiff, after having had a chance to absorb what had happened at the meeting, defend himself or state that he was being treated unfairly during his post-meeting interactions with Sullivan (which were, for the most part, one-on-one and occurred in a more personal, less intimidating forum for Plaintiff to voice any concerns he may have had). It strikes the Court as simply incredible that if the accusations were baseless, Plaintiff would not, at the very least, discuss the unfairness of the situation with Sullivan. Second, the tone of Plaintiff's resignation letter is conciliatory and apologetic. For example, Plaintiff wrote: "Please except [sic] my apologies for any inconvenience and know that I will extend any courtesies this department should need on business I conducted. Thank you for your time." This language is hardly indicative of an employee whose character and integrity has been baselessly attacked. To the contrary, it indicates that Plaintiff, confronted with known

circumlocutions, misrepresentations and omissions, accepted the consequences of his actions and voluntarily opted for the lesser of two evils.

Based upon the foregoing, the circumstances and facts of this case convince the Court that Plaintiff voluntarily resigned and was not constructively discharged.  Thus, there was no deprivation of a property interest in employment and Plaintiff's procedural due process claim must fail.  See Stone, 855 F.2d at 173.

    2.  No Property Interest

Alternatively, Plaintiff's procedural due process claim fails because the Court finds that as a probationary employee, Plaintiff did not have a property interest in his continued employment. Property interests in continued employment are not derived from the Constitution, but rather are created and defined by existing rules, policies, regulations, statutes, and judicial decisions. See Perry v. Sindermann, 408 U.S. 593, 601-02 (1972).  An employee has a property interest in his job only when he has a "legitimate claim of entitlement to it."  See Bd. of Regents, 408 U.S. at 577 (emphasis added).  This means that the claim of entitlement must be more than a subjective, unilateral expectation or an abstract need or desire.  Id.  Moreover, "the general principle is that when public employees only can be dismissed for cause[,] they have been given a property interest in their employment."  Joslyn v. Kinch, 613 F. Supp. 1168, 1178 (D.R.I. 1985) (emphasis added).

In the present case, it is undisputed that at the time Plaintiff resigned, he was a probationary employee, and as such, could be terminated without cause. See Lincoln Town Charter, Article IX, § C9-1(2) ("All members of the force shall, at the time of their permanent appointment, have served for a period of not less than six months in a probationary status during which period they may be removed at any time by the Town Administrator upon recommendation of the Chief of Police, with or without cause."). Based upon this provision, Plaintiff clearly cannot be classified as an employee who inherits a property interest in his employment by virtue of only being able to be dismissed for cause. The unambiguous language in the Town Charter, therefore, leads the Court to conclude that any claim of entitlement to a property interest in continued employment Plaintiff claims to have had is not legitimate, but only a subjective, unilateral expectation or abstract need or desire. Moreover, the Court notes that the overarching theory behind Plaintiff's property interest claim is tenuous at best. By its very nature, a probationary period signifies a period of time during which an employee is tested to see whether that employee is deserving of the status of a permanent member of the police force, with the concomitant vested right to a property interest in continued employment. See Donato v. Plainview-Old Bethpage Cent. Sch. Dist., 96 F.3d 623, 629 (2d Cir. 1996) ("The very nature of a probationary appointment - as the term

28

itself implies — is that employment may be terminated should the employer be dissatisfied."). It would defy logic, and ultimately render the common understanding of the probationary period meaningless, therefore, to find that a probationary employee could achieve a right to continued employment without first being tested for the position. At all times, Plaintiff was aware that as a probationary employee, he would be subject to strict review and could be discharged for any reason without a hearing. There is simply no evidence that probationary police officers have ever been treated as anything but at-will employees by the Town of Lincoln.

In an effort to dodge the clear import of the Town Charter's termination without cause provision, Plaintiff attempts to focus on Sheppard's belief about which provision of the Town Charter granted her the authority to terminate Plaintiff's employment. This argument, however, incorrectly draws attention away from the proper inquiry, which is whether Plaintiff reasonably expected that his employment would continue. See Cummings v. S. Portland Hous. Auth., 985 F.2d 1, 2 (1st Cir. 1993) (a public employee has a constitutionally protected property interest in continued employment "when he reasonably expects that his employment will continue"); Bennett v. City of Boston, 869 F.2d 19, 21-22 (1st Cir. 1989) ("irrespective of the City's actual reasons for dismissing him," "for cause" contractual rights for provisional employees do

not create constitutionally protected property rights because of special status given to provisional employees) (emphasis added).

For these reasons, judgment shall enter for Defendants and against Plaintiff on Count IV.

B.   <u>State Law Claims</u> (Counts I and II)

The Court's earlier finding that Plaintiff voluntarily resigned from his job does not bode well for Plaintiff's state law claims, both of which, in Plaintiff's Amended Complaint, have been entitled "Failure to follow proper procedure." In Count I, Plaintiff "has alleged that [Sheppard] failed to follow the proper procedure in terminating him under Article IX of the Town Charter" by not receiving a recommendation from Kells to terminate Plaintiff's employment. Article IX provides, in relevant part: "All members of the force shall, at the time of their permanent appointment, have served for a period of not less than six months in a probationary status during which period they may be removed at any time by the Town Administrator upon recommendation of the Chief of Police, with or without cause." Article IX, § C9-1(2).

Similarly, Count II "is predicated on [Sheppard's] authority to terminate someone under Article VI of the Town Charter" without a finding of cause. Article VI provides that the Town Administrator has the power to, among other things: "Appoint and, when necessary for the good of the services, remove all officers and employees of the Town except as otherwise provided by this

30

Charter, and except as he may authorize the head of a department or office to appoint and remove subordinates in such department or office." Article VI, § C6-6(1). The Rhode Island Supreme Court has interpreted the language "for the good of the service" in section C6-6(1) of the Town Charter as a for cause provision requiring a showing of "legally sufficient cause." <u>Kells v. Town of Lincoln</u>, 874 A.2d 204, 212 (R.I. 2005).

Upon scrutinizing the Amended Complaint and the parties' pre- and post-trial submissions, the Court concludes that Counts I and II are premised upon a finding that Sheppard actually terminated Plaintiff's employment. As has already been discussed, however, Plaintiff voluntarily resigned - a conclusion that obviates the need to decide whether Sheppard followed the proper termination procedure or even whether Sheppard possessed the authority to terminate Plaintiff's employment without a finding of cause. It is true that had Plaintiff declined to resign and had Sheppard gone further by then unilaterally firing him, the contours of this case would be different. But that is not the way the events of late-August 2005 unfolded. This Court is not permitted to issue what would amount to an advisory opinion detailing the procedures the Town Administrator must follow and the boundaries of the Town Administrator's authority to fire employees under the Town Charter in a case in which the Town Administrator has not actually terminated someone's employment. Those determinations are best

31

left to another day, or to clarification through the legislative process.

Accordingly, judgment shall enter for Defendants and against Plaintiff on the state law claims set forth in Counts I and II.

C.   <u>Substantive Due Process</u> (Count V)

Similar in name but markedly different from a procedural due process claim, "a substantive due process claim implicates the essence of state action rather than its modalities; such a claim rests not on perceived procedural deficiencies but on the idea that the government's conduct, regardless of procedural swaddling, was in itself impermissible." <u>Amsden v. Moran</u>, 904 F.2d 748, 753 (1st Cir. 1990). To show a substantive due process violation, a plaintiff must show that a defendant's actions meet the "conscience-shocking" standard. <u>See Depoutot v. Raffaelly</u>, 424 F.3d 112, 118 (1st Cir. 2005). Although there is not one precise, all encompassing definition of what constitutes "conscience-shocking" conduct, the First Circuit has explained that a plaintiff must show something more egregious and extreme than "[m]ere violations of state law, even violations resulting from bad faith" <u>Id.</u> at 119; <u>see also Amsden</u>, 904 F.2d at 754 n.5. Various phrases to describe conscience-shocking conduct include "arbitrary and capricious," "counter to the concept of ordered liberty" or "shocking or violative of universal standards of decency." <u>Cruz-</u>

Erazo v. Rivera-Montanez, 212 F.3d 617, 622 (1st Cir. 2000) (citing Amsden, 904 F.2d at 753-54.

The facts of this case come nowhere near these exacting standards. Even were the Court to accept Plaintiff's various justifications for why he believes he truthfully answered most of the questions on the forms related to his Lincoln application and 2005 psychological evaluation, the most he criticizes Defendants for is failing to perform a thorough, independent investigation to confirm aspects of Gallagher's letter and the Pawtucket background investigation report. While it could be argued that Defendants were negligent in this respect, there is nothing to show that Defendants' actions were maliciously motivated or calculated to cause harm to Plaintiff. Compared to the extreme behavior which has been subjected to the conscience-shocking test, see, e.g., Harrington v. Almy, 977 F.2d 37, 43-44 (1st Cir. 1992) (holding that a reasonable fact finder could conclude that requiring a penile plethysmograph as a condition of reinstatement rose to the level of a substantive due process violation), the Court finds that Defendants' actions do not constitute a substantive due process violation.[13]

---

[13] Additionally, the Court notes that Plaintiff's post-trial brief (not surprisingly) offers no case law to support his substantive due process argument apart from a general reference to Amsden, a case in which the First Circuit rejected a plaintiff's substantive due process claim because a regulatory board's revocation of a surveyor's license failed to meet the conscience shocking standard. See Amsden, 904 F. 2d at 757.

IV.   <u>Conclusion</u>

For the foregoing reasons, it is hereby ordered that judgment shall enter on all counts against Plaintiff and in favor of Defendants.


IT IS SO ORDERED.


_William E. Smith_
William E. Smith
United States District Judge

Date: 6/26/06